**Russell PHILLIPS, Plaintiff,**

v.

**LENOX HILL HOSPITAL and District 1199, National Union of Hospital and Health Care Employees, RWDSU, AFL–CIO, Defendants.**

**No. 86 Civ. 1026 (RWS).**

United States District Court,
S.D. New York.

Oct. 14, 1987.

Hall & Sloan, New York City, for plaintiff; Burton H. Hall, of counsel.

Seyfarth, Shaw, Fairweather & Geraldson, New York City, for defendant Lenox Hill Hosp.; Eric Rosenfeld, of counsel.

Sipser, Weinstock, Harper & Dorn, New York City, for defendant Local 1199; Richard. Dorn, of counsel.

## OPINION

SWEET, District Judge.

Defendant Local 1199, Drug, Hospital and Health Care Employees Union, RWDSU, AFL–CIO ("Local 1199"), has moved pursuant to Fed.R.Civ.P. 56 to dismiss plaintiff Russell Phillips' ("Phillips") complaint. Defendant Lenox Hill Hospital ("Lenox Hill") has moved pursuant to Fed. R.Civ.P. 12(b)(6) to dismiss various of Phillips' complaints against it. Phillips has opposed both applications and submitted affidavits, thus converting Lenox Hill's application into a motion for summary judgment pursuant to Fed.R.Civ.P. 12(c), and all parties have been afforded reasonable opportunity to present all pertinent material. This action was originally heard on February 13, 1987, at which leave to submit additional papers was granted. Parties extended this deadline several times by stipulation. The motion was finally marked fully submitted on July 22, 1987, on receipt of a July 21 letter from counsel for Local 1199. For the reasons set forth below, the defendants' motions for summary judgment are granted, and the case dismissed.

### Facts

Phillips was an employee of Lenox Hill within the bargaining unit represented by defendant Local 1199 from December 1979 until his discharge in November, 1983. Throughout the period of his employment, Phillips was an active member of the union and one of several union members who were also openly associated with the Progressive Labor Party ("PLP") and International Committee Against Racism ("InCAR"). According to Phillips, during the period of his employment by Lenox Hill, and thereafter, Phillips incurred the hostility of Local 1199 officials because he, PLP and InCar opposed their policies and had

opposed their election. According to the Union, there was no such hostility.

Another employee of Lenox Hill, in the bargaining unit represented by the Union, was Andres Alfonso ("Alfonso"). According to Phillips, in mid-October, 1986, Alfonso physically assaulted Ali Hawana ("Hawana"), a co-worker, at the work place. His assault was witnessed by Hawana and by another co-worker, Al Pennetti ("Pennetti").

Early in the morning of October 28, 1983, Phillips spoke to fellow employees and others, outside the hospital, with a sign on a tripod criticizing the government's sending of U.S. Marines to Beirut. Alfonso came by, saw the sign, and was incensed by it. According to Phillips, Alfonso went into the hospital building, came out with a three-foot long two-by-four, and assaulted Phillips with it. Phillips sought to protect himself by holding the tripod in front of him and by retreating. Alfonso swung repeatedly at Phillips, striking the tripod and forcing Phillips to retreat beyond the edge of the street. Alfonso kept swinging at Phillips and hitting the tripod. Finally, walking back to the building, Alfonso took a swipe at Phillips' shopping bag. Among the persons who witnessed Alfonso's assault with the two-by-four on Phillips were Mercedes Ortiz ("Ortiz"), a co-worker, and Dorothy Moore ("Moore"), a guard. Shortly after this incident, Alfonso told Leo Bethge ("Bethge"), Lenox Hill's director of engineering, either that he was "going to kill" Phillips or "get even" with him.

At or about noon on October 28, 1983, an encounter occurred between Alfonso and Phillips in the hospital building, in which Alfonso's lip was bloodied. It was witnessed by Adrien Brumaire ("Brumaire") and Steven Czapp ("Czapp"). Lenox Hill suspended Alfonso and first suspended and subsequently discharged Phillips, purportedly because of the October 28 encounter. Both employees grieved.

At an initial meeting in Bethge's office, on October 31, 1983, both Alfonso and Phillips gave statements, of which summaries were made. In his statements, Alfonso described his earlier, early-morning encounter with Phillips by saying that there was an exchange of words between them only.

The Union scheduled "Step 3" hearings for Alfonso and Phillips: it originally scheduled a "joint" hearing, but Phillips' was adjourned. At Phillips' Step 3 hearing, the summaries of the statements made in Bethge's office were read. Brumaire testified that he had seen the noon-hour assault of Alfonso on Phillips: he had seen Alfonso strike Phillips and Phillips raise his arm in defense. Ortiz testified that she had seen Phillips and another fighting outside the hospital that morning. Lenox Hill then called Czapp and another co-employee, Martinez. Czapp said he saw Phillips' elbow strike Alfonso but did not know whether it was an accident; and that he and another man pulled Alfonso away from Phillips. Martinez said he was the other man. After the hearing, Phillips was fired.

According to Lenox Hill, on November 17 it referred the two cases to the American Arbitration Association ("AAA") for joint arbitration. By letter of November 23, 1983, Phillips asked the Union's organizer, Glenston Clarke, to ask for arbitration. On November 29, William Hoffman ("Hoffman"), Lenox Hill's Director of Employee Relations and Labor Relations, spoke with Floris Saunders ("Saunders"), a Vice President of Local 1199. Hoffman told Saunders that the Hospital had requested joint arbitration, and Saunders agreed. Phillips spoke with Clarke about the issue on December 5, 1983, and Clarke said that the union intended to demand arbitration. At both meetings Phillips requested written confirmation, which was not forthcoming. Clarke told Phillips that the hospital had requested arbitration but could not explain why it, the employer, had done so. In its request for arbitration on December 6, 1983, the Union, by its counsel Richard Dorn ("Dorn"), Esq., advised the American Arbitration association ("AAA") that the Union and Lenox Hill had agreed to a single arbitration on the two issues. Phillips was not notified of this agreement.

In December, 1983, by telephone inquiry to AAA, Phillips learned that the hospital had made a request for a joint arbitration

of his discharge and Alfonso's suspension. Phillips wrote to Saunders in a letter dated December 21, stating what he had learned and protesting that, although the Union was obligated to represent him aggressively, it would not be able to do so if it represented both employees in a joint arbitration.

By letter of December 28, 1983, Dorn responded to Phillips' letter to Saunders, stating that the Union had requested arbitration of Phillips' discharge. Dorn did not enclose a copy of the request, and did not address the joint representation issue. In particular, Dorn did not advise Phillips that the Union had agreed to a joint arbitration.

Phillips wrote to Dorn directly on January 4, 1984, stating that as of December 21, 1983, the AAA had had requests from both Local 1199 and Lenox Hill for joint arbitration, and emphasizing that a joint arbitration of Phillips' discharge and Alfonso's suspension would doubtless require a neutral stance by the Union when only a vigorous, partisan presentation of the evidence would win back Phillips' job.

Dorn replied to Phillips by letter of January 18, 1984, explaining why the Union had agreed to consolidation, and telling Phillips that, if he preferred, the Union would attempt to have the AAA separate the cases. On January 23, 1984, Phillips wrote back as follows:

As I pointed out in my earlier letter to you, it is essential that District 1199 establish and contend that my involvement in the "fight" was one of passive defense ... that I was attacked by the other member. Therefore it is not simply a matter of my preference, but it is imperative that the two cases be separated.

By letter of January 30, 1984, Dorn requested that the AAA separate the cases, which Lenox Hill opposed. On February 27, 1984, the AAA advised the parties that it did not have authority to sever the cases without consent of both parties after an Arbitrator had been appointed, which, by this time, one had. The AAA suggested that Local 1199 could, if it wished, present the issue of severance to the Arbitrator. The Union did move to sever, urging essentially the argument first advanced by Phillips—that the Union would be put in the position of simultaneously treating each of the two employees as a hostile witness while representing him in the presentation of his grievance. The Arbitrator denied the application, holding:

I am satisfied, after careful consideration, that I can preside over a consolidated arbitration of the instant grievances and afford both Grievants their full rights under the collective bargaining agreement. This is not to say that I am unaware of some additional burdens such a presentation may present to the Union. It is not clear, however, that the peculiar burdens accompanying the representation of members with potential conflicts in interest might not exist even if the cases were severed. *The question may very well be one of who is to represent the individual Grievants rather than whether their cases can be heard in the same proceeding.* (emphasis added)

Early in March, Phillips appeared at the offices of Sipser, Weinstock, Harper, Dorn & Leibowitz, Esqs., attorneys for Local 1199, after receiving a request to do so. He met with Mary Jill Hanson, Esq. ("Hanson") who had been assigned to represent him. Alfonso was also present in the office. Phillips again protested against joinder of the two cases, on the grounds that the Union and its representative could not effectively represent him if it was also representing Alfonso before the same arbitrator. According to Phillips, "Hanson announced that she would make something 'clear' to me: that she was representing *the Union* in this arbitration, and that she was *the Union's* lawyer, not mine." (emphasis Phillips') Phillips says that Hanson said that there was "no point" in discussing the question with him of how he was to be represented.

At the arbitration hearings, Phillips was seated at the same table with Alfonso, and both were represented by Hanson. Repeatedly, Phillips protested to her that it was her responsibility to him to be aggressive in cross-examining hostile witnesses,

in particular Alfonso and Czapp. Hanson responded that Phillips had no complaint.

Phillips asked Hanson to examine Alfonso about his assault on Hawana; According to Phillips, she refused. At the arbitration hearing, Alfonso testified that Phillips had assaulted Alfonso with the tripod. Phillips asked Hanson to examine Alfonso concerning an alleged discrepancy between that testimony and what Alfonso had said in his statements to Bethge. Hanson did not do so.

Phillips asked Hanson to cross-examine Czapp, who testified for Lenox Hill that Phillips had assaulted Alfonso, concerning an alleged discrepancy between what he had said at the Step 3 hearing (that he had been turning away from the scene to hand bricks to his helper on the scaffold) and his testimony at arbitration that he had witnessed the entire encounter between Alfonso and Phillips. He also asked her to cross-examine Czapp concerning a further discrepancy; Czapp had stated at the Step 3 hearing that he did not know whether Phillips, in raising his arm, had been seeking to defend himself against Alfonso or trying to hit Alfonso; but at arbitration had testified that he "used an elbow to hit Mr. Alfonso ...." Phillips was unsatisfied with Hanson's cross-examination of Czapp.

According to Phillips, he asked Hanson to call Ortiz and Moore (who he says witnessed the early morning assault by Alfonso on Phillips with a two-by-four) and Hawana and Pennetti (who had witnessed Alfonso's earlier assault on Hawana). Phillips has sworn that, in response, Hanson "answered that the question was up to Mr. Clarke (i.e., up to the Union) to decide, and was not up to her. She was the Union's lawyer, not mine."

Phillips has not submitted affidavits as deposition testimony from Ortiz, Moore, Hawana, or Pennetti, so the record is barren of competent evidence as to what they would have said had they testified. Hanson has submitted an affidavit unequivocally denying that the union ever dictated to her what witnesses to call, and swears that she exercised her professional judgment at all times in making decisions about the case.

Because of what he viewed as Hanson's failure to vigorously represent him, Phillips demanded and was afforded an opportunity to testify by making a "statement" about matters left out of the hearing, which he feels he did clumsily, damaging his case. Phillips did, however, specifically bring to the Arbitrator's attention what he believed were the vital discrepancies in both Alfonso's and Czapp's testimony.

Lenox Hill, as one of its exhibits, submitted to Hoffman's notes of Alfonso's Step 3 hearing. These notes revealed that Clarke had stated to Hoffman that Phillips, and not Alfonso, was the aggressor in their noon-hour encounter. Hoffman's notes were accepted into evidence, but, in his opinion, the Arbitrator specifically disregarded Clarke's statements on the grounds that Clarke was not a witness to the incident.

On September 25, 1984, while the arbitration proceeding was still in progress, Clarke (on behalf of the Union) and Hoffman (on behalf of Lenox Hill) entered into a "Settlement Agreement," reducing Alfonso's suspension. As page 2 of the agreement, the Union and Lenox Hill appended a statement that their action was "based on mutual determination that Mr. Alfonso was not the aggressor in the incident that occurred on October 28, 1983 ....' The entire Settlement Agreement, including this second page, was then presented to and received by the Arbitrator. In his final opinion, the Arbitrator explicitly disregarded the "mutual determination" in the settlement.

On March 6, 1985, Phillips wrote Vicki Erenstein ("Erenstein"), counsel who had inherited his arbitrations because Hanson had left the firm. The letter read: "While Alfonso was a party to the arbitration, it was necessary to refrain from characterizing him as the aggressor, but his settlement relieves the Union of that burden." The union subsequently submitted a posthearing brief—which the court has examined and found to be of high caliber—arguing: that the incident never rose to the

level of a fight; that the evidence proved Alfonso was the aggressor; and that Lenox Hill fired Phillips because of his activism, not the alleged incident.

On August 10, 1985, the Arbitrator handed down his award, finding that Phillips was the aggressor, and that there was no basis on which to mitigate his discharge.

**Applicable Law**

Phillips has alleged two causes of action. The first cause is what has come to be known as hybrid § 301/fair representation action. *See DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 165, 103 S.Ct. 2281, 2291, 76 L.Ed.2d 476 (1983). In the second, Phillips has asserted that the injury done to him by the union's breach of its duty of fair representation infringes on the rights of free speech and assembly protected by § 101(a)(2) and § 102 of the Labor–Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. §§ 411(a)(2), 412.

**Hybrid § 301/Fair Representation**

■ Hybrid § 301/Fair Representation claims are brought by an employee against both the employer and the union. Collective bargaining agreements generally contain procedures for the settlement of disputes through alternative dispute resolution devices such as grievance and arbitration procedures, and when a labor contract thus entrusts dispute resolution to an arbitrator, the courts generally defer to the chosen tribunal. However, the position of individual employees as against the employer is protected in these contractual disciplinary proceedings only when the recognized bargaining agents—the unions—faithfully discharge their obligation under the collective bargaining system. Consequently the law has imposed on unions the duty of fair representation of individual employees. *Hines v. Anchor Motor Freight*, 424 U.S. 554, 564, 96 S.Ct. 1048, 1056, 47 L.Ed.2d 231 (1976). Because "the integrity of the arbitral process" depends on the faithful execution of this duty by the union, when the union breaches its duty, the provisions of the collective bargaining agreement that provide for the finality of the arbitrator's decision are no longer binding on any of the parties. *Id.* at 567, 96 S.Ct. at 1057–58.

■ The elements that a plaintiff must show in this type of action are analogous to those in a standard tort action: injury, breach, and causation. Plaintiff must prove a "discharge contrary to the contract," *Hines*, 424 U.S. at 570, 96 S.Ct. at 1059; the union's failure to meet its obligation of fair representation, *id.*, and a showing that "there is substantial reason to believe that [the breach] contributed to the erroneous outcome of the contractual proceedings," *id.* at 568, 96 S.Ct. at 1058. The elements against both defendants are identical. *DelCostello*, 462 U.S. at 165, 103 S.Ct. at 2291 ("the case he must prove is the same whether he sues one, the other, or both.").

**First Element: Discharge Contrary to Contract (Injury)**

Phillips' complaint alleges that Lenox Hill fired him because of his insistent and pointed criticism of management, and that the charges relating to his alleged altercation with Alfonso were false and pretextual. After Alfonso's settlement with Lenox Hill, Local 1199 adopted exactly this position in its post-hearing submission to the Arbitrator: "the Employer seized upon the incident as a pretext to rid itself of Phillips, a union delegate and political activist, who had been a 'thorn' in this hospital's side."

The affidavits and documents that Phillips has produced create a triable issue of fact both as to Lenox Hill's motive for discharging Phillips and as to whether he was, indeed, the aggressor. That the Arbitrator made factual findings against Phillips on both these points is not to the contrary, because if "the process has fundamentally malfunctioned by reason of the bad faith performance of the union," *Hines*, 424 U.S. at 569, 96 S.Ct. at 1059, then the Arbitrator's factual findings are no longer contractually final and binding against Phillips. Indeed, that the arbitrator had to make factual findings on these issues after carefully considering the evidence underscores Phillips' contention that there is a factual dispute that must be

resolved as to the wrongfulness of his discharge, if, of course, there are triable issues of fact with respect to the remaining elements.

### Second Element: Duty of Fair Representation (Breach)

Phillips puts forward four ways in which the Union failed to adhere to its duty of fair representation: first, that it was a breach of the duty of fair representation for the Union to agree to the consolidation of his case with Alfonso's at the outset; second, that it allowed the same lawyer to represent both him and Alfonso in the same proceeding when their interests were diametrically opposed; third, that it reached a settlement in mid-arbitration with Lenox Hill finding that Alfonso, by "mutual determination," was "not the aggressor in the incident," an implicit determination that Phillips was; and, finally, that it directed his counsel's strategy, even to the extent of deciding what witnesses counsel would and would not call, thus depriving Phillips of counsel's best professional judgment. Underlying all of these charges is Phillips' assertion that Local 1199, like Lenox Hill, was looking to sell him down the river because of his radical political views and repeated charges that Union leaders were too cozy with management.

■ As the Supreme Court has said, "The grievances processes cannot be expected to be error-free. The finality provision has sufficient force to surmount occasional instances of mistake." *Hines*, 424 U.S. at 571, 96 S.Ct. at 1059. However, "A breach of the statutory duty of fair representation occurs ... when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). Phillips, submits that the Union's decisions of how to proceed in the case were so irrational as to fall under the "arbitrary" branch of the test. In particular, Phillips urges the court to establish a rule that it is "arbitrary" by definition to have the same union lawyer represent different

parties in the same proceeding if the parties' interests are so clearly opposed.

■ With respect to the consolidation claims, Phillips has failed to make a showing that the Union's actions were arbitrary. A desire to avoid inconsistent outcomes and an interest in economy in dispute resolution are both interests which a union might properly consider in agreeing to a consolidation. While a self-interested party might prefer separate proceedings in order to gain a litigational advantage from the possibility of inconsistent outcomes, in these circumstances, consolidation in itself does not impose any kind of cognizable prejudice on either party.

The same, however, cannot be so easily said about having the same counsel represent two parties with strongly adverse interests. The *Model Code of Professional Responsibility* provides, "A lawyer should *never* represent in litigation multiple clients with differing interests ...." EC 5–15 (emphasis added). Construing the Canons of Professional Ethics adopted by the American Bar Association in 1937, a Pennsylvania court held: "No one could conscionably contend that the same attorney may represent both the plaintiff and defendant in an adversary action. Yet, that is what is being done in this case." *Jedwabny v. Philadelphia Trans. Co.*, 390 Pa. 231, 235, 135 A.2d 252, 254 (1957), *cert. denied*, 355 U.S. 966, 78 S.Ct. 557, 2 L.Ed.2d 541 (1958). In this case, the parties' interests are sharply in conflict, and the only way that they could consistently be represented was to advance the theory that there was no fight, a position which deprived each of the two of the potent defense that the other was the aggressor. Without the consent of both parties given after full disclosure of the linking conflict, such joint representation would not be permitted in a court proceeding. Here by no means did Phillips consent.

Conflict of interest rules for labor arbitrations appear less stringent, although there is not a wealth of authority on the issue. A case has been cited from a district court in the District of Columbia addressing a similar claim arising out of the

joint grievance of two workers involved in an altercation. The court held:

> [A] union must necessarily, and without violating anyone's rights, represent employees who have antagonistic interests. The union may also represent such parties jointly, in the grievance process, without violating its duty of fair representation. Here, the union took a neutral ground and did not, in its arguments to the arbitrator, favor one party over the other. The extraordinary doctrine which plaintiff urges—a totally separate defense team for each union member with a divergent interest—is costly and without precedent. The union certainly did not act arbitrarily by declining to devise this expensive, new method of presenting its members' grievances.

*Johnson v. American Postal Workers Union, AFL–CIO*, 102 LRRM 3089, 3091 (D.D. C.1979) (citations omitted).

Among the authorities relied upon by the *Johnson* Court was *Crusco v. Fisher & Bro., Inc.*, 458 F.Supp. 413 (S.D.N.Y.1978), in which a union lawyer had made a presentation to an arbitrator on behalf of two factions with divergent interests in a seniority dispute, after which each faction was able to make a presentation or correct anything that he had said. The union sided with neither faction. While *Crusco* does stand for the proposition that there are times when it is appropriate for the union to be involved in an arbitration in which its members are at odds, it does not control on these facts. Here, the issue is whether it is appropriate for parties to a grievance proceeding to share counsel when it is one party's chosen strategy to discredit the facts that the other seeks to put forth. To perform that task, counsel would have to conduct and defend a cross-examination simultaneously. Assuming that this a lawyer cannot do, the issue then becomes the degree to which a grievant can control the strategy of his arbitration proceeding. It will be assumed that under these circumstances it was a breach of the union's duty to provide a single counsel to represent parties whose interests were so antagonistic.

With respect to the settlement, it seems a plain breach of duty for the union to make an implicit determination on the record that Phillips—whose case depended on not being found the aggressor—was, indeed, the aggressor. Finally, it would also be a clear breach of the unions' duty to deny a member access to necessary witnesses in retaliation for his past activism.

**Third Element: Likelihood that the Breach Contributed to Erroneous Outcome in Hearing (Causation)**

Of the three actions which might be said to establish the union's breach—the settlement, allowing Clarke to decide which witnesses to call, and joint counsel for Phillips and Alfonso—it remains to be seen whether any of these potential breaches "contribute to the erroneous outcome of the contractual proceedings." *Hines*, 424 U.S. at 570, 96 S.Ct. at 1059. That is, unless there is some causal connection between the breach and the alleged erroneous outcome, then Phillips has no action.

As to the settlement, the arbitrator explicitly disregarded it in his opinion, removing any doubt that it might have influenced his decision. Thus, in this respect, Phillips' action fails.

■ Turning to Phillips' affidavit that Clarke controlled the witnesses that Phillips wanted to call, taking Phillips' facts as true and Hanson's version as dissembling (as the court must for this application), Phillips has established a breach of the union's duty. However, Phillips has not provided the court with affidavits or deposition testimony from the uncalled witnesses to establish what they would have testified at the arbitration, an absence of proof which is fatal. By failing to demonstrate by competent evidence that the substance of the uncalled witnesses' testimony might in any way have affected the outcome of the arbitration, Phillips "has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Finally, with respect to the issue of joint counsel, Phillips argues that his counsel

breached her duty to him by not vigorously arguing that Alfonso was the aggressor. Quite the contrary, in a detailed post-hearing submission, counsel skillfully marshalled the evidence presented at the hearing, arguing that Alfonso and not Phillips was the aggressor. Phillips' position apparently is that this submission is inadequate because counsel's activities before Alfonso was out of the case failed to elicit the evidence necessary to sustain that proposition. In particular, Phillips urges that a contradiction in Alfonso's testimony at the hearing with that he gave at an early stage of the grievance had not been brought out, and that the possibility that Czapp had misperceived events, demonstrated also by his statements at an earlier proceeding, had not been properly brought out either.

Beginning with Czapp, the issue upon which Phillips banks is that Czapp testified at an earlier stage that he was unsure whether Phillips had hit Alfonso on purpose or by accident. In addition, Phillips urges that the Arbitrator was not fairly presented with the theory that Czapp took his eyes off the fight at a crucial moment. An examination of the record, however, reveals that both theories were fairly before the arbitrator, either through Phillips' testimony, through the post-hearing submission, or through notes of Czapp's prior testimony which were received in evidence. In fact, the Arbitrator discusses the issue in some detail in his opinion.

As to the alleged discrepancy in Alfonso's earlier testimony, the notes memorializing Alfonso's earlier explanation of the morning incident—omitting mention of a physical confrontation—were in evidence, and Phillips himself drew the Arbitrator's attention to the discrepancy during his own testimony. In addition, although counsel did not cross-examine Alfonso about the discrepancy, she did question Hoffman, establishing that in Alfonso's original statement in the earlier proceedings he omitted any mention of picking up a Two-by-Four in his morning encounter with Phillips.

In sum, because of the happenstance of Alfonso settling his half of the case, the union made exactly the arguments that Phillips had urged it to do so, and all of the theories he wishes the arbitrator had considered—even now with the greater knowledge of hindsight—were indeed properly before the Arbitrator at the time of the decision. Although it may be so that vigorous cross-examination of Alfonso would have sharpened the charged "discrepancy," the document on which the difference was based was in evidence and the Arbitrator's attention was directed to it by Phillips himself. Given that, in the end, the union adopted Phillips' position that Alfonso was the aggressor, given that all the necessary factual information was properly before the Arbitrator, and given the strength of the union's post-hearing brief on his behalf, the potential breach of the union's duty by not providing Phillips and Alfonso with separate counsel did not contribute to any erroneous result. Under all these circumstances, Phillips' claim is reduced to a complaint about the tactics by which the union made its case, not about the substance of the case, and such a claim does not sustain a breach of good faith action.

**Phillips' LMRDA Claim**

As his Second Cause of Action, Phillips alleges that the bad faith, hostile actions of District 1199 were committed in retaliation for his exercise of his rights of free speech and assembly, guaranteed by § 101(a)(2) of the Labor–Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. § 411(a)(2), and that they infringed his exercise of these rights, entitling him to appropriate relief pursuant to § 102 of the LMRDA, 29 U.S.C. § 412. Phillips does not allege that any of the union's actions complained of constitutes "discipline" under either § 101(a)(5) of the LMRDA or § 609 thereof, 29 U.S.C. §§ 411(a)(5).

According to Phillips, the courts have made clear that an "infringement" claim is distinct from a "discipline" claim, so that actions by a union which would not constitute "discipline" may nevertheless be actionable under § 102 for "infringement" of Title I rights. *Finnegan v. Leu*, 456 U.S.

431, 439, 102 S.Ct. 1867, 1872, 72 L.Ed.2d 239 (1982). The distinction between the two types of claim was explained in *Morrissey v. National Maritime Union,* 544 F.2d 19, (1976), where the defendant union had the union member arrested, and maliciously prosecuted him, for having distributed leaflets, inside the union hall, contesting the officials' policies. Of the various claims brought by the member against the union and its officials, two were grounded on the LMRDA: one for "infringement" of his rights under § 101(a)(2); the other for "discipline" in violation of § 101(a)(5). Both LMRDA claims were joined, in a single question put to the jury, and on that question the jury awarded small compensatory but substantial punitive damages. The Court, reviewing, found that damages may have been justified for the "infringement" claim alone, but held that, as a matter of law, what was done to the member did not constitute "discipline," and remanded for trial on the § 101(a)(2) "infringement" claim alone.

Local 1199, however, argues that here, unlike *Morrissey,* the union's action was done in the context of labor management relations, and, therefore, is outside the range of LMRDA liability, an argument that Phillips concedes is sound as to "discipline" claims. That is, even retaliatory action by the union, in undermining a discharge grievance because of animus against a member for exercise of LMRDA rights, is probably not "discipline" under the LMRDA. However, Phillips suggests an overlap of Title I's "infringement" coverage with the duty of fair representation: where a union retaliates against a member because of his exercise of Title I, LMRDA rights by failing to represent him adequately, it infringes his exercise of those rights, and is liable for doing so under § 102 of the LMRDA.

Whether Title I creates a claim that essentially duplicates the duty of fair representation need not be considered, for even assuming the soundness of Phillips' legal theory, he has no action here. According to Phillips, his Title I rights were violated by the damage done him by the union's breach of its duty. However, as shown,

either the union's duty was not breached or there was no adequate showing that the alleged breach contributed to an erroneous result in the arbitration, and thus he has failed to create a triable issue of fact with respect to the event that he has designated as "infringing" under Title I.

**Conclusion**

For the reasons set forth, the defendants' motion for summary judgment is granted and the case is dismissed.