**John M. LETTIS, Plaintiff,**

v.

**UNITED STATES POSTAL SERVICE, National Association of Letter Carriers, NALC Branch 6000, and Employees at the Williston Park Post Office so named—Peggy Eng—Postmaster, Fred Otto, Joe Celentano, Andy Kachianos, Don Daly, and Dominic A. Prestano, Defendants.**

**No. CV 95–737 (ADS).**

United States District Court,
E.D. New York.

Aug. 12, 1998.

186

Amrod and Ricci, Garden City, NY (John B. Amrod, of counsel), for plaintiff.

Zachary W. Carter, United States Attorney, Eastern District of New York, Brooklyn, NY, by Michael J. Goldberger, Assistant U.S. Attorney, for defendants United States Postal Service, Peggy Eng, Fred Otto, Joe Celentano, and Andy Kachianos.

Cohen, Weiss and Simon, New York City (Richard M. Seltzer, Tamir W. Rosenblum, Peter Zwiebach, of counsel), for defendants National Association of Letter

Carriers, NALC Branch 6000, Don Daly, and Dominic A. Prestano.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This action arises from the claims of the plaintiff, John M. Lettis ("Lettis" or the "plaintiff"), against the United States Postal Service (the "USPS") and several of its employees (collectively, the "Postal Service Defendants") for the breach of the national collective bargaining agreement (the "CBA") between the USPS and the defendant, the National Association of Letter Carriers ("NALC"), and against the defendants NALC and its local branch, the National Association of Letter Carriers Branch 6000 ("Branch 6000" and collectively, the "Union"), for the breach of their duty of fair representation, in violation of the Postal Reorganization Act (the "PRA"), 39 U.S.C. § 1208. The gravamen of the plaintiff's action is that the USPS violated the CBA by suspending and then terminating his employment, and the Union failed to represent him properly in the resulting grievances and arbitrations. Presently before the Court are the defendants' motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## I. BACKGROUND

Lettis had been employed as a letter carrier since 1968, for a period of twenty-six (26) years. As a letter carrier, he was a member of NALC, which is the postal employees' collective bargaining representative, and its affiliated local labor organization, Branch 6000, for which he was, at one time, a shop steward. Even before the events which culminated in this action, Lettis had a history of disciplinary actions taken against him. On June 27, 1991, Lettis was issued a letter of removal from the USPS (the "June 27, 1991 removal letter"). The June 27, 1991 removal letter listed verbal abuse and threats to employ-ees, as well as the failure to follow instructions, as the reasons for his termination. The letter alleged that: (1) Lettis verbally abused and cursed at two employees and threatened to take them outside; (2) when a supervisor intervened, Lettis screamed obscenities at the supervisor and asked him to go outside to settle it; and (3) Lettis' verbal explosion lasted from approximately 8:15 A.M. until 10:00 A.M., at which time Lettis left work for a doctor appointment. The letter also listed previous actions including harassment of other employees, such as telling an employee that she was "dead meat" while making a throat-slitting gesture and telling another employee that she should watch out for him.

In response to the June 27, 1991 removal letter, Branch 6000 filed a grievance. On August 26, 1991, the grievance was settled. The settlement provided, among other things, that although the removal was just and proper, Lettis would not be terminated but would be placed on probation for one (1) year during which time he would follow all lawful instructions and rules, receive psychological counseling, and conduct himself in a manner that would not be offensive to other people.

On February 21, 1992, before his probationary period ended, Lettis was issued another letter of removal (the "February 21, 1992 removal letter"). The February 21, 1992 removal letter cited the plaintiff's failure to follow instructions and unauthorized extension of street time as the reasons for his removal. Branch 6000 filed a grievance challenging the removal, which ultimately proceeded to arbitration. On May 10, 1992, the arbitrator ruled in Branch 6000's favor, rescinded the removal, and reinstated Lettis to his previous position. However, the arbitrator held that Lettis was not without fault and therefore, refused to award back pay. In addition, Lettis' probationary period was extended to May 10, 1993, one (1) year from the date of the arbitration award.

## A. *The Emergency Suspension*

On November 16, 1993, approximately six months after Lettis' probation resulting from the February 21, 1992 removal letter ended, while working at the post office in Williston Park, New York branch (the "Williston Park Post Office"), Lettis and a fellow letter carrier, the defendant Andrew Kachianos ("Kachianos"), were involved in an altercation. The plaintiff alleges that Kachianos tripped and kicked him in the knee, and spit in his face. Marion Kang, a fellow postal employee, allegedly witnessed the entire incident. The plaintiff contends that as he went to get the defendant, Joe Celentano ("Celentano"), the acting supervisor, he saw Bob Green ("Green") intervene and restrain Kachianos in a bear hug. Shortly thereafter, the police were summoned to the scene.

After the incident with Kachianos, Lettis maintains that Celentano and the defendant, Postmaster Peggy Eng ("Eng"), attempted to coerce him to make a statement outside the presence of a union delegate or shop steward, in contravention of his rights under the CBA and the law. Thereafter, Celentano and Eng directed Lettis to go home and not to return to the Williston Park Post Office until further notification. Lettis obeyed the order while Kachianos lingered on the scene. When the police arrived, only Kachianos who was with the defendant, Don Daly ("Daly"), Branch 6000's shop steward, was permitted to speak with the police.

On November 17, 1993, Lettis was advised by the defendant Dominic A. Prestano ("Prestano"), Executive Vice–President of Branch 6000, not to report to work until further notification. By letters dated November 18, 1993, Lettis and Kachianos were placed on emergency suspension by the USPS (the "Emergency Suspension"), which advised them that they were placed in an off-duty, without pay status, effective November 16, 1993 because they might be injurious to themselves and others. The letter of suspension addressed to Lettis gave the following sole reason for the USPS' action:

> On November 16, 1993 you and letter Carrier Kachianos were involved in an altercation on the workroom floor. In that you may be injurious to yourself or other employees, to retain you in an active duty status would not be in the best interest of the Postal Service.

(Prestano Decl. dated May 29, 1998 ("Prestano Decl."), Ex. 6.)

Branch 6000 filed a grievance on behalf of Lettis, objecting to his suspension. Branch 6000 appointed Don Daly, the only shop steward at that time at the Williston Park Post Office, to represent Lettis in Step One of the grievance procedure. On November 24, 1993, the grievance was denied by the USPS at the Step One meeting with management. Lettis was not present at the Step One meeting.

Branch 6000 pursued the grievance to Step Two. On December 10, 1993, a Step Two hearing was held. Prestano represented Lettis in Step Two; he did not handle any stage of Kachianos' grievance. The USPS denied the grievance.

On December 13, 1993, Branch 6000 sent a grievance summary to William Yates ("Yates"), the National Business Agent for the New York region, to obtain his approval to submit the grievance to final and binding arbitration. On December 16, 1993, Yates filed for arbitration.

On February 25, 1994, the arbitration regarding the Emergency Suspension was held. The plaintiff was represented by Prestano and the USPS was represented by a senior labor relations specialist, a non-attorney. At the arbitration, the USPS offered a settlement that included some back pay and a transfer to a different post office as a regular carrier. However, upon learning that he would only be a substitute carrier and would lose all seniority, Lettis rejected the settlement offer.

NALC and the USPS stipulated that the following issue was to be decided by Arbi-

trator Margaret Leibowitz: "Did the Service violate Article 16, Section 7 of the National Agreement when it placed the Grievant, Mr. John Lettis, on off-duty, non-pay status effective November 16, 1993 at 1405 hours? If so, what shall be the remedy?" On March 11, 1994, Arbitrator Leibowitz issued an Opinion and Award denying NALC's grievance (the "March 11, 1994 Award"). Arbitrator Leibowitz characterized NALC's position as follows:

> The Union contended that the Service lacked just cause for the emergency off-duty placement of the Grievant. The Union argued that the Service improperly invoked Article 16, Section 7 with respect to the Grievant because he was the victim of a physical and verbal assault by Mr. Kachianos. The Union further asserted that the Grievant was subjected to disparate treatment because he was not returned to duty three weeks after the incident when Mr. Kachianos was returned to duty. As a remedy, the union demanded that the Grievant be reinstated with full back pay, overtime, benefits and interest.

(Prestano Decl., Ex. 11 at 5.) In rendering an award for the USPS, Arbitrator Leibowitz summarized the testimony as follows:

> Based upon the testimony of Mr. Otto, Mr. Celentano and the Grievant, I find that the Grievant participated in an altercation with Mr. Kachianos on the workroom floor which involved yelling and verbal threats, and which required supervisory intervention. Mr. Celentano's credible and unrebutted testimony established that the Grievant and Mr. Kachianos were very excited as they yelled and threatened each other, and that the argument escalated. Mr. Celentano further testified that he was concerned about keeping the two men apart during the commotion. Mr. Celentano also explained that he and the Postmaster decided to place the two employees on emergency off-duty status so that

they would not be in the Post Office at the same time.

(Prestano Decl., Ex. 11 at 7.) The March 11, 1994 Award reflects that the issue of who initiated the altercation was irrelevant to the Emergency Suspension:

> It is well-accepted in labor arbitration that fighting on the job constitutes serious misconduct. Verbal threats, yelling, and other aggressive and hostile behavior compromise the safety and security of all employees and will not be condoned at the workplace. The Grievant's participation in the November 16, 1993 altercation with Mr. Kachianos was unacceptable and constituted disciplinable misconduct. Under these circumstances, the Service was justified in finding that the Grievant was "injurious to self and others."

(*Id.* at 8.)

B. *The Removal*

By letter dated March 28, 1994, Lettis was advised of his discharge from the USPS, effective May 2, 1994 (the "Removal"). This letter listed the following three reasons for Lettis' termination:

> (1) Verbal threat of a fellow postal employee. This charge included shouting at Kachianos in an aggressive and threatening manner, threatening Kachianos with physical harm, and telling Kachianos to see Lettis after work;
>
> (2) Creating a hostile work environment. This charge stated that several employees interviewed had said that Lettis engaged in threatening, harassing, and coercive behavior toward them; and
>
> (3) Conduct unbecoming a postal employee. This charge related to Lettis' criminal conviction for attempted assault in 1974.

(Prestano Decl., Ex. 12.) The Removal prompted Branch 6000 to file a grievance objecting to Lettis' discharge. On March 31, 1994, Shop Steward Daly conducted the Step One grievance, which was denied by

the USPS. On April 18, 1994, Prestano conducted the Step 1A hearing. Step 1A was an alternate grievance step that was analogous to a Step Two meeting. On May 3, 1994, Prestano participated in the Step Three hearing.

On June 9, 1994, an arbitration hearing was held before Arbitrator Joseph Sirefman as to the following issue stipulated by the Union and the USPS: "Did the [Postal] Service have just cause to remove Grievant John Lettis on March 28, 1994. If not, what shall the remedy be?" Prestano represented Lettis and the USPS was represented by a non-attorney. By an Award and Opinion dated August 23, 1994, Arbitrator Sirefman upheld the Removal on two of the three grounds cited in the letter dated March 28, 1994. Charge Three, relating to Lettis' 1974 conviction for attempted assault, was dismissed as being too remote. Although Arbitrator Sirefman recognized that Lettis has changed since 1991 by becoming a born-again Christian and trying to stay out of conflict, he held that Lettis' history of disciplinary problems coupled with his conduct during the altercation with Kachianos, justified his termination:

> Even if, arguendo, Kachianos can be considered the aggressor (CP. Fred Otto's written statement said "I clearly heard taunting by John Lettis towards Andy Kachianos"), it is the duty of each participant to step backward, and to de-escalate the tension. A participant who physically or verbally continues to extend the conflict and increase its intensity commits a very serious offense, and, in effect, becomes the aggressor.... Given Lettis' history of threats and confrontations, (including a relatively recent reinstatement with two years probation after a removal), Lettis' taunting of Kachianos and his prolongation of the altercation by continued threats supports removal. Although Kachianos apparently responded in kind his short suspension was not disparate treatment. Management's sense that Kachianos had been taunted once too often is supported by

the testimony and statements of other employees as to the tense atmosphere Lettis created over the years. In addition, Kachianos did not have a record of discipline. Each employee must be considered on the basis of his or her individual record. The distinction between the two employees drawn by Management was justified.

(Prestano Decl., Ex. 19 at 9–10.) Arbitrator Sirefman concluded that

> [b]oth the words and behavior of the employees are eloquent testimony to their genuine and reasonable concern, even fear, about working with Grievant, based upon numerous incidents which have persisted long after the time he claims to have changed his ways. He is not being charged for old incidents, as the Union claims. However, the older incidents, coupled with the more recent ones in Charges 1 and 2, are simply the continuation of an unfortunate pattern of behavior. Postal employees, be they Clerks, Carriers, or Managers, are entitled to a workplace free of the types of worries, anxieties and tension Lettis creates.

(*Id.* at 13.)

## C. *The District Court Complaint*

The plaintiff, proceeding *pro se*, commenced this action on February 15, 1995. On or about April 24, 1996, the plaintiff retained counsel and a motion was made to amend the complaint. By a Memorandum Decision and Order dated August 28, 1997, the Court granted the plaintiff leave: (1) to add the National Association of Letter Carriers and the United States Postal Service as defendants; (2) to add Don Daly and Dominic A. Prestano as defendants, to the extent that the plaintiff seeks to assert supplemental state causes of action against them and the applicable statute of limitations would not bar such claims; (3) to assert a cause of action arising from the arbitration held on February 25, 1994 as to the plaintiff's suspension from the Willi-

ston Park Post Office, to the extent that such claim accrued within six months prior to February 15, 1995, the date the original complaint was filed; and (4) to assert supplemental state causes of action against the defendants Peggy Eng, Joseph Celentano, Andrew Kachianos, and Frederick Otto.

On September 29, 1997, the plaintiff filed the First Amended Complaint alleging a hybrid action against the Union for breach of the duty of fair representation in the handling of his grievances and arbitrations, and against the USPS for suspending and terminating his employment without just cause, in breach of the CBA. The plaintiff also alleges state law claims of: (1) defamation as against Otto, Celentano, and Eng; (2) conspiracy to deprive him of his employment and future employment as against Prestano, Celentano, Eng, Daly, and Otto; (3) intentional infliction of emotional distress as against Prestano, Celentano, Eng, Daly, and Otto; and (4) assault and battery as against Kachianos.

## II. DISCUSSION

### A. Summary Judgement Standard

A court may grant summary judgment only if the evidence, viewed in the light most favorable to the party opposing the motion, presents no genuine issue of material fact, *Samuels v. Mockry,* 77 F.3d 34, 35 (2d Cir.1996), and the movant is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(c) (setting forth summary judgment standard). The Court must, however, resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion. *See Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir.1995); *Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566, 568 (2d Cir.1990); *W.A. Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11–12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

According to the Second Circuit "[s]ummary judgment is a tool to winnow out from the trial calendar those cases whose facts predestine them to result in a directed verdict." *United Nat'l Ins. Co. v. Tunnel, Inc.,* 988 F.2d 351, 355 (2d Cir.1993). Once a party moves for summary judgment, the non-movant must come forward with specific facts showing that a genuine issue exists to avoid the motion being granted. *West–Fair Elec. Contractors v. Aetna Cas. & Surety Co.,* 78 F.3d 61, 63 (2d Cir.1996); *see also Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (quoting Fed.R.Civ.P. 56(e)). A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505; *see Vann v. New York City,* 72 F.3d 1040, 1049 (2d Cir.1995).

However, mere conclusory allegations, speculation, or conjecture will not avail a party resisting summary judgment. *See Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *See Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 129 (2d Cir.1996); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991). Finally, the Court is charged with the function of "issue-finding," not "issue-resolution." *Gallo v. Prudential Residential Services, Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994).

It is within this framework that the Court addresses the grounds for the present motions for summary judgment.

### B. The Union and the USPS

The PRA, 39 U.S.C. § 1208, provides federal subject matter jurisdiction for actions against the USPS for breach of a collective bargaining agreement, to the same extent that the district courts have subject matter jurisdiction over such claims brought against private sector em-

ployers. Noting the PRA's explicit incorporation of the NRLA, courts considering claims against the USPS have applied the same limitations to such claims that apply to claims brought against private sector employers pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a). *See Nat'l Ass'n of Letter Carriers, AFL—CIO v. Sombrotto*, 449 F.2d 915, 918 (2d Cir.1971); *Fraternal Order of Police, National Labor Council, USPS No. 2 v. United States Postal Service*, 988 F.Supp. 701, 708 (S.D.N.Y.1997); *Local 300, National Postal Mail Handlers Union, AFL—CIO v. United States Postal Service*, No. 93 CIV. 2720, 1994 WL 658393, at *4 (S.D.N.Y. Nov.21, 1994).

▮ Under federal labor law, an employee may bring a complaint against his or her union and the employer alleging: (1) that the employer breached a collective bargaining agreement; and (2) that the union breached its duty of fair representation in redressing her grievance against the employer. *See DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 163–64, 103 S.Ct. 2281, 2289–91, 76 L.Ed.2d 476 (1983); *Vaca v. Sipes*, 386 U.S. 171, 184–86, 87 S.Ct. 903, 913–15, 17 L.Ed.2d 842 (1967). The limitations period on a hybrid suit where a plaintiff sues the employer and the union is six (6) months from the date the plaintiff knew or should have known of the breach. *See DelCostello*, 462 U.S. at 169–71, 103 S.Ct. 2281; *White v. White Rose Food*, 128 F.3d 110, 114 (2d Cir.1997); *Cohen v. Flushing Hosp. & Med. Ctr.*, 68 F.3d 64, 67 (2d Cir.1995). The plaintiff may sue the union or the employer, or both, but must allege violations on the part of both, *White*, 128 F.3d at 114, and consequently, an allegation that a union breached its duty of fair representation is a necessary component of a claim against the employer, *Flanigan v. (International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America) Truck Drivers Local No. 671*, 942 F.2d 824, 828–29 (2d Cir.1991); *Walton v. Marx*, No. 93 CIV. 6770, 1994 WL

592705, at *6 (S.D.N.Y.1994) (citing *Breininger v. Sheet Metal Workers Int'l Ass'n*, 493 U.S. 67, 82–83, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989)). With this brief legal reference as background, the Court begins its analysis with the threshold issue of whether the Union breached its duty of fair representation and examines separately the numerous claims advanced by the plaintiff.

### 1. The Union

#### a. Emergency Suspension

▮ The Union asserts that any claim brought against it arising from the Emergency Suspension is time-barred. As stated above, the plaintiff's claim against the Union for breach of the duty of fair representation is governed by a six-month statute of limitations. Generally, "the cause of action accrue[s] no later than the time when plaintiff[ ] knew or reasonably should have known that such a breach had occurred, even if some possibility of nonjudicial enforcement remained." *Cohen*, 68 F.3d at 67 (quoting *Santos v. District Council*, 619 F.2d 963, 969 (2d Cir.1980)); *see also Buttry v. General Signal Corp.*, 68 F.3d 1488, 1492 (2d Cir.1995) (quoting *Flanigan*, 942 F.2d at 827). Where a plaintiff's cause of action is based on the union's inadequate representation during the course of and through to the conclusion of an arbitration, the statute of limitations begins to run when there has been an adverse outcome in the arbitration. *Ghartey v. St. John's Queens Hospital*, 869 F.2d 160, 163–66 (2d Cir.1989). In *Ghartey*, the Second Circuit reasoned that a challenge to the adequacy of a union's representation in an arbitration would be "inefficient and premature" if filed before the issuance of an arbitration award. *Id.* at 163. The Second Circuit further stated that "intervention by the district court [before the conclusion of the arbitration proceeding] would be unnecessary, superfluous, and wasteful." *Id.* The Second Circuit emphasized that in *Ghartey*,

we deal not with a union manifestly opposing, rejecting or abandoning the interests or claims of a member, but rather with a union purporting to fulfill its duty of fair representation throughout an arbitration hearing process. In such circumstances, we will not attribute to an unsophisticated employee instant knowledge of tactical or legal errors made by her own advocate, "the best possible champion of [her] cause," *see Childs,* 831 F.2d at 435. Rather, the employee is entitled, during the hearing process, to trust in the abilities of her representative and "reasonably believe[ ] the Union [is] proceeding in good faith," *see King,* 785 F.2d at 35, at least until an adverse arbitral decision suggests otherwise. Knowledge of the breach by the Union will not be attributed to Ghartey prior to the issuance of the award. *See Samples v. Ryder Truck Lines, Inc.,* 755 F.2d 881, 887 n. 7 (11th Cir.1985).

*Id.* at 165. Therefore, "under the 'knew or should have known' test for accrual of the hybrid claim, the employee in *Ghartey* first 'should have known' about that claim only after entry of the arbitrator's decision." *Buttry,* 68 F.3d at 1492. However, the Second Circuit did not reach the issue of whether the statute of limitations was tolled until the plaintiff received a copy of the award. *Ghartey,* 869 F.2d at 165 n. 2.

■ Applying *Ghartey* to the present action, the Court finds that the plaintiff's cause of action did not accrue until Arbitrator Liebowitz rendered the March 11, 1994 Award. The plaintiff's assertions regarding the Emergency Suspension relate to arguments allegedly not raised, evidence not submitted, and witnesses who were not called at the arbitration hearing. Similar to *Ghartey,* the Union represented the plaintiff in the Emergency Suspension grievance process through the issuance of the arbitrator's decision. The Union asserts that Lettis "at no time before, during or immediately after the arbitration hearing suggested that additional witnesses

should have been called or that any additional documents or evidence should have been introduced," (Prestano Aff. dated 5/29/98 ¶ 25), which assertion Lettis disputes claiming that "[t]here were several times during the arbitration that I objected to the way that Prestano handled the case," (Lettis Aff. dated 6/27/98 ("Lettis Aff.") ¶ 15). Regardless of whether Lettis was aware of the alleged defects in Branch 6000's representation of him during the arbitration hearing held on February 25, 1994 or before as is evidenced by his complaints to the NLRB and to Congressman Levy regarding the delay in proceeding to the Emergency Suspension arbitration, (*see* Lettis Aff. dated 6/27/98 ¶ 25; Seltzer Decl. dated 5/5/98, Ex. F at 74–75), *Ghartey* instructs the Court that the plaintiff was entitled to rely upon the skill of his union representatives and to focus his energies on the arbitration. Therefore, the statute of limitations did not begin to run until Arbitrator Liebowitz issued the March 11, 1994 Award. Even assuming that the plaintiff's cause of action did not accrue until he received a copy of the March 11, 1994 Award two weeks after it was issued, (*see* Lettis Aff. ¶ 18), the plaintiff's claim arising from the Emergency Suspension proceedings is still time-barred. Lettis, originally proceeding *pro se,* commenced this action on February 22, 1995, almost five (5) months after the limitations period expired. Consequently, the Court concludes that the plaintiff's claim for breach of the duty of fair representation arising from the Emergency Suspension grievance process, is time-barred.

■ The plaintiff attempts to salvage this claim by contending that: (1) the filing of the NLRB charge against Branch 6000 tolls the statute of limitations; and (2) Branch 6000's conduct throughout the Emergency Suspension and Removal proceedings are "inextricably interwined" and hence, since his claim pursuant to the Removal proceedings is timely, his claim pursuant to the Emergency Suspension is brought within the six-month statute of

limitations. The Court is unpersuaded by these arguments.

On September 20, 1994, Lettis filed a complaint against Branch 6000 with the regional NLRB, alleging that it had committed an unfair labor practice. The complaint states that "[s]ince on or about June 9, 1994, the above-named labor organization by its officers, agents and representatives has failed and refused to represent John Lettis at his arbitration regarding his discharge." (Prestano Decl., Ex. 20.) On November 2, 1994, the regional NLRB denied Lettis' claim and refused to issue a complaint. He appealed the decision to the NLRB General Counsel in Washington, D.C. On December 20, 1994, the General Counsel rejected Lettis' claim and upheld the regional NLRB's decision to deny issuance of a complaint. The plaintiff claims that when Lettis received the final determination from Washington, D.C., "[t]hat completed plaintiff's exhaustion of his administrative remedies." (Pl.'s Memo. in Opp. § I.)

First, the Court notes that the plaintiff's NLRB charge relates to the Removal proceedings, not the Emergency Suspension proceedings. The NLRB charge states that "since on or about June 9, 1994," Branch 6000 committed an unfair labor practice stemming from its representation, or lack thereof, of the plaintiff regarding his "discharge." June 9, 1994 is the date that the arbitration hearing was held on the Removal. All proceedings relating to the Emergency Suspension had been completed prior to June 9, 1994. Hence, the Court concludes that the NLRB charge related to the Removal proceedings, not the Emergency Suspension proceedings.

■ Second, even if the NLRB charge related to the Emergency Suspension proceedings, courts within the Second Circuit and other circuits have held that exhaustion of NLRB procedures is not a prerequisite to filing an action in federal court against a union for breach of the duty of fair representation, and the filing of a complaint with the NLRB does not toll the statute of limitations of a subsequent federal court action. *See Arriaga–Zayas v. International Ladies' Garment Workers' Union—Puerto Rico Council,* 835 F.2d 11, 13–14 (1st Cir.1987); *Conley v. International Brotherhood of Electrical Workers, Local 639,* 810 F.2d 913, 915–16 (9th Cir. 1987); *Adkins v. International Union of Elec., Radio, & Mach. Workers,* 769 F.2d 330, 335 (6th Cir.1985); *Kolomick v. United Steelworkers of America, Dist. 8,* 762 F.2d 354, 355–57 (4th Cir.1985); *LaVigna v. WABC Television, Inc.,* No. 92 Civ. 4330, 1993 WL 288206, at *2 (S.D.N.Y. July 23, 1993); *Katsaros v. Transit–Mix Concrete Corp.,* 615 F.Supp. 450, 452 (S.D.N.Y.1985); *Niedzwiecki v. Circuit Protective Devices,* Civ. No. B 84–648, 1985 WL 6224 (D.Conn. March 22, 1985); *Boyd v. Teamsters Local Union 553,* 589 F.Supp. 794, 796–97 (S.D.N.Y.1984). This Court concurs with numerous other courts which have reached the conclusion that a unfair labor charge filed with the NLRB does not toll the statute of limitations for an action filed in federal court arising from the same nucleus of operative facts.

■ Regarding the plaintiff's theory that the Emergency Suspension and the Removal proceedings are "inextricably intertwined," Lettis states that he

> ... has not sued separately for a claim based upon the suspension. The claim is based upon the suspension and removal taken together. It is plaintiff's contention that the improper removal resulted, at least in part, from the Union's mishandling of the suspension arbitration and grievance proceeding. Had the Union adequately represented him in the suspension proceeding, there most likely would have been a different result in the removal proceeding, if, indeed, USPS would have pursued a removal if they had lost at the suspension hearing. The two proceedings are inextricably intertwined.

(Pl.'s Memo. in Opp. § I.) The plaintiff proposes a novel doctrine of tolling the

statute of limitations but cites no case law in support of his theory. Generally, a statute of limitations would apply unless a tolling principle is applicable. The Court interprets the plaintiff's argument as one alleging a continuous violation. However, the Court finds that such a tolling principle is inapplicable to the present case.

██ For purposes of determining whether the statute of limitations bars a claim, "the proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." *Lorance v. AT&T Technologies,* 490 U.S. 900, 109 S.Ct. 2261, 2266, 104 L.Ed.2d 961 (1989) (citing *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980)). Lettis was allegedly damaged as a result of the Emergency Suspension proceedings, giving him the benefit of the doubt, at the latest, when he received a copy of the March 11, 1994 Award. No further acts by the Union were necessary to further complete or amplify the plaintiff's damages arising from the Emergency Suspension.

In addition, in the case of *Local Lodge No. 1424 v. NLRB,* 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960), a union had been charged with unfair labor practices for enforcing an agreement that was allegedly improperly executed twelve months earlier at which time the union did not represent a majority of the employees in the bargaining unit. *Local Lodge No. 1424,* 362 U.S. at 415, 80 S.Ct. at 825–26. The Supreme Court pondered the question of whether the execution of the agreement, which was allegedly unlawful but time-barred as to suit, could nevertheless be relevant in determining whether conduct within the limitations period relating to enforcement of the agreement was unlawful. The Supreme Court stated:

> It is doubtless true that § 10(b) does not prevent all use of evidence relating to events transpiring more than six months before the filing and service of an unfair labor practice charge. Howev-

er, in applying rules of evidence as to the admissibility of past events, due regard for the purposes of § 10(b) requires that two different kinds of situations be distinguished. The first is one where occurrences within the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices. There, earlier events may be utilized to shed light on the true character of matters occurring within the limitations period; and for that purpose § 10(b) ordinarily does not bar such evidentiary use of anterior events. The second situation is that where conduct occurring within the limitations period can be charged to be an unfair labor practice only through reliance on an earlier unfair labor practice. There the use of the earlier unfair labor practice is not merely "evidentiary," since it does not simply lay bare a putative current unfair labor practice. Rather, it serves to cloak with illegality that which was otherwise lawful. And where a complaint based upon that earlier event is time-barred, to permit the event itself to be so used in effect results in reviving a legally defunct unfair labor practice.

*Id.* at 416–17, 80 S.Ct. at 826–27.

██ Thus, in the present case, the plaintiff is not barred from using evidence of the events surrounding the Emergency Suspension proceedings to "shed light" on a breach of the duty of fair representation arising from the Removal proceedings, since conduct even if time-barred as a separate ground for relief, can shed light on claims which are within applicable time limits. *See Haerum v. Air Line Pilots Assoc.,* 892 F.2d 216, 219 (2d Cir.1989). However, Lettis may not use such evidence to establish a substantive violation where otherwise there would be none.

Finally, the Court notes that in his affidavit, the plaintiff asserts that he filed the NLRB charge "[f]ollowing the advice of a federal official." (Lettis Aff. dated 6/27/98 ¶ 32.) The plaintiff, who is now represent-

ed by counsel, does not argue that he was wrongly advised by any of the defendants that he must first file a charge with the NLRB before he will be permitted to file an action in federal court, and therefore, that this affirmative misrepresentation prohibits the defendant from asserting the statute of limitations as a defense. Hence, the issue of estoppel is not before the Court.

In sum, the Court finds that the plaintiff's claim of breach of the duty of fair representation arising from the Suspension proceedings, is time-barred. Consequently, the Court grants the Union's motion for summary judgment regarding this claim.

### b. *Removal*

 The duty of fair representation requires that a union make "an honest, thorough effort to present [the employee's] claims through the arbitral process in a manner best calculated to secure [his or her] rights under the collective bargaining agreement." *Samuels v. Air Transport Local 504*, 992 F.2d 12, 16 (2d Cir.1993). To sustain a claim of unfair representation, a plaintiff must demonstrate: (1) that the union's actions were arbitrary, discriminatory or in bad faith, *see Vaca*, 386 U.S. at 190, 87 S.Ct. at 916; and (2) that the union's conduct seriously undermined the arbitral process, *see Hines v. Anchor Motor Freight*, 424 U.S. 554, 568, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976). A union's action may be arbitrary if "in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness,' as to be irrational." *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 68, 111 S.Ct. 1127, 1130, 113 L.Ed.2d 51 (1991) (citation omitted). In the Second Circuit, the test is whether the union's conduct or omissions fall "so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary." *N.L.R.B. v. Local 282, International Brotherhood of Teamsters*,

740 F.2d 141, 147 (2d Cir.1984). Allegations of negligence or errors by a union in processing grievances are insufficient. *See United Steelworkers of America v. Rawson*, 495 U.S. 362, 372–73, 110 S.Ct. 1904, 1911–12, 109 L.Ed.2d 362 (1990) (mere negligence does not state a claim of unfair representation); *Barr v. United Parcel Service, Inc.*, 868 F.2d 36, 43 (2d Cir.), *cert. denied*, 493 U.S. 975, 110 S.Ct. 499, 107 L.Ed.2d 502 (1989) (tactical errors in failing to present witnesses and inadequate representation by union business agent insufficient to demonstrate bad faith or arbitrariness); *Cook v. Pan American World Airways, Inc.*, 771 F.2d 635, 645 (2d Cir. 1985) (failure to prevail before arbitrator does not establish breach of duty of fair representation). In *Barr*, the Second Circuit also noted that:

> [i]n hindsight, any decision a union makes in the informal yet complex process of handling its member's grievances may appear to the losing employee to be erroneous.... Tactical errors are insufficient to show a breach of the duty of fair representation; even negligence on the union's part does not give rise to a breach. "[P]roof of mere negligence or errors of judgment ... is insufficient.... 'As long as the union acts in good faith, the courts cannot intercede on behalf of employees who may be prejudiced by rationally founded decisions which operate to their particular disadvantage.'"

*Barr*, 868 F.2d at 43 (quoting *Cook v. Pan American World Airways, Inc.*, 771 F.2d 635, 645 (2d Cir.1985), *cert. denied*, 474 U.S. 1109, 106 S.Ct. 895, 88 L.Ed.2d 929 (1986)). Absent a showing of arbitrary, discriminatory, or bad faith conduct, the award of an arbitrator whose decision the parties have contractually agreed to accept will be final and may not be disturbed. *Barr*, 868 F.2d at 43 (citing *DelCostello*, 462 U.S. at 163–65, 103 S.Ct. 2281).

Lettis argues that the Union breached its duty of fair representation in its representation of him during the Removal griev-

ance and arbitration proceedings. Specifically, he alleges that the Union: (1) did not inform him when the Step One meeting was to occur nor was he invited to attend; (2) failed to assign separate representatives to Kachianos and him at the Step meetings, which constituted a conflict of interest; (3) moved slowly in the grievance proceedings until Lettis contacted his Congressman; (4) failed to call Bob Green, Billy Fisher, Bill Britton, Nick Sicilano, and Bud Peterson, Lettis' pastor, as witnesses; (5) failed to locate a potential witness, a truck driver, who was allegedly present in the post office when the November 16, 1993 altercation occurred; (6) failed to introduce into evidence a climate survey dated October 1993 of the Williston Park Post Office which allegedly indicates the poor communication and performance of management; (7) failed to introduce evidence of Kachianos' alleged mental and disciplinary problems or the drinking which occurred at the Williston Park Post Office; (8) failed to strike Otto's testimony because Otto only testified in part, refusing to give further testimony "without counsel"; and (9) failed to inform him of his right to counsel at the arbitration. For the reasons set forth below, the Court finds that while each of the specifically alleged breaches may, with the benefit of hindsight, be viewed as a possible tactical error or negligence by the Union, none of them, taken either singly or collectively, are nearly sufficient to make out a *prima facie* case that the Union breached its duty fairly to represent the plaintiff The Court examines each of the plaintiff's allegations of the Union's misconduct.

### i. *Breach of Duty*

#### *Notification of the Step One Meeting and Right to Counsel*

■ Lettis alleges that he was not informed of when the Step One meeting would occur nor was he invited to attend the meeting. The Union counters that its practice is not to have the grievant participate in the early steps of the grievance

procedure, partly due to its experience that "it is difficult to get management to respond in a constructive manner if the grievant is present." (Prestano Decl. ¶ 4.) Indeed, Lettis acknowledges that "it may be unusual for the employee to be present at the Step 1 hearing." (Lettis Aff. dated 6/28/98 ¶ 8.) In addition, the Union emphasizes that there is no requirement that a grievant be present at Step One meeting where, as here, the Union, not the individual, has initiated the grievance. Article 15 of the CBA which governs the procedures utilized in grievances and arbitrations explicitly states that

> [t]he Union also may initiate a grievance at Step 1 within 14 days of the date the Union first became aware of (or reasonably should have become aware of) the facts giving rise to the grievance. In such case the participation of an individual grievant is not required.

(Prestano Decl., Ex. 1 at 75.)

■ The failure to keep a grievant informed of the status of the grievance is not a breach of the duty of fair representation. *Caputo v. National Association of Letter Carriers*, 730 F.Supp. 1221, 1230 (E.D.N.Y.1990) (citing *Whitten v. Anchor Motor Freight, Inc.*, 521 F.2d 1335, 1341 (6th Cir.1975), *cert. denied*, 425 U.S. 981, 96 S.Ct. 2188, 48 L.Ed.2d 807 (1976)); *see also Higdon v. United Steelworkers of America*, 706 F.2d 1561, 1562 (11th Cir. 1983) (failure to give grievant opportunity to attend and notice of one segment of grievance process not breach of duty). "A union does not act unfairly when it fails to consult with or advise a grievant of its bargaining activities." *Caputo*, 730 F.Supp. at 1230 (citing *Marietta v. Cities Service Oil Co.*, 414 F.Supp. 1029, 1036 (D.N.J.1976)). Application of the foregoing principle and the uncontested evidence that the employee is not usually present in the early steps of the grievance procedure due to the counterproductive nature of the employee's presence, lead the Court to conclude that in this Court's opinion, any oversight by the Union to advise Lettis of

his right to be present at the Step One meeting or the date of such, constitutes, at most, mere negligence.

■ Furthermore, in his complaint, Lettis maintains that the Union breached its duty of fair representation by not providing him with an attorney. (First Am. Compl. ¶ 43.) The plaintiff has shifted his position and now maintains that the Union breached its duty by not informing him of his right to obtain private counsel at his own expense. (Lettis Aff. dated 6/28/98 ¶ 30.) In the Court's view, both arguments advanced by the plaintiff fail to establish a breach by the Union.

■ A grievant has no right to a private attorney, or to require a union to utilize a lawyer, at an arbitration. *Henry v. Community Resource Center, Inc.*, No. 95 Civ. 5480, 1996 WL 251845, at *8 (S.D.N.Y. May 13, 1996) (rejecting the plaintiff's argument that she was entitled to an attorney and citing to cases in other circuits holding same); *see also Baxter v. United Paperworkers Int'l Union, Local 7370*, 140 F.3d 745, 747 (8th Cir.1998). "In fact, '[f]ederal law provides that unions are to be the exclusive bargaining representative for workers in union shops and, as such, disfavors attorney involvement in grievance resolution.'" *Henry*, 1996 WL 251845, at *8 (quoting *Johnson v. United Steelworkers*, 843 F.Supp. at 947 (citing *Castelli v. Douglas*, 752 F.2d at 1484)). However,

> [t]his is not to say, . . . that a union may act arbitrarily or in bad faith concerning the presence of counsel in an arbitration. For example, a union must provide nondiscriminatory representation to all bargaining unit employees, without reference to union membership status. When a union customarily provides an attorney to union members in arbitration proceedings, the refusal to provide an attorney to represent a nonunion employee at arbitration is a breach of the duty of fair representation.

*Castelli v. Douglas Aircraft Co.*, 752 F.2d 1480, 1483 (9th Cir .1985) (citations omitted).

Lettis has not presented any evidence that the Union's use of an officer, not a lawyer, for the arbitration was a departure from the Union's previous policy. Indeed, in Prestano's experience, Branch 6000 has never hired attorneys to represent it in disciplinary arbitration hearings. (Prestano Decl. ¶ 7.) The USPS did not use attorneys for any of the Removal proceedings. (Prestano Decl. ¶ 22, 29.) Lettis does not cite to a provision in the CBA or in the Union Constitution which would entitle him to counsel at any stage of the grievance proceedings. In addition, the plaintiff had been through the arbitral process in 1991 and 1992 and was successfully represented by Prestano on both occasions. (Prestano Decl. ¶¶ 10–13; Ex. 5.) Further, even if the Union neglected to inform Lettis of his right to retain a private attorney, such omission, in the Court's view, constitutes mere negligence.

### Assignment of Daly to Represent Lettis and Kachianos at Step One

■ Lettis contends that Daly's representation of both Kachianos and himself at Step One of the grievance proceedings presented a conflict of interest. The Court is unaware of, nor does the plaintiff cite to, any case law in support of the plaintiff's argument that the representation of two employees in separate grievance proceedings by the same union official constitutes a per se breach of the duty of fair representation. Indeed, "a union must necessarily, and without violating anyone's rights, represent employees who have antagonistic interests." *Johnson v. American Postal Workers Union, AFL— CIO*, 102 L.R.R.M. 3089, 3091 (D.D.C.1979) (citing *Humphrey v. Moore*, 375 U.S. 335, 349–350, 84 S.Ct. 363, 371–72, 11 L.Ed.2d 370 (1964)). "Absent a showing that the union actually took a position in arbitration adverse to [the grievant], petitioner cannot prevail." *Mackey v. James Seeman Stu-*

*dios, Inc.,* 509 F.Supp. 1046, 1046–47 (S.D.N.Y.1981); *see also Hellums v. Quaker Oats Co.,* 760 F.2d 202, 204–06 (8th Cir.1985) (union does not violate its duty of fair representation even if it is neutral as to the credibility of the grievants involved in an altercation). Although Lettis maintains that the failure of the Union to assign separate representatives at the preliminary meetings constituted a clear conflict of interest, Daly was the sole shop steward at the Williston Park Post Office. In addition, the Union maintains that there was no assistant shop steward at the Williston Park Post Office at the time of Lettis' Removal, nor does Lettis raise an issue of fact by identifying such an individual.

The Union maintains that

[t]he elected shop steward in a Post Office is almost always assigned to represent Branch 6000 during Step One of a grievance at that Post Office, particularly in post offices with fewer than 49 employees, such as Williston Park, where the CBA permits only one steward. Ex. 1 [the CBA] at 92. Only on extremely rare occasions when the shop steward is unavailable to present the Step One grievance will another individual be designated by the Branch.

(Prestano Decl. ¶ 8; *see also* Whalen Decl. dated 6/4/98 ¶ 4.) Lettis does not raise an issue of fact as to the Union's regular procedures for having the shop steward represent a grievant at Step One or the fact that Daly was the only shop steward assigned to the Williston Park Post Office. Prestano represented Lettis at the other steps of the Removal grievance procedure and the arbitration hearing. Lettis does not allege that Prestano also represented Kachianos in the other grievance steps.

Furthermore, Lettis does not expand upon how Daly and the Union's representation of Kachianos and himself created a conflict of interest. Although Lettis maintains that the Union did not believe his version of the altercation, when asked at his deposition whether he had any evidence as to Prestano's bad faith in representing him, Lettis answered that Prestano became upset when questioned as to why Kachinos was returned to work while he was not. (*See* Seltzer Decl., Ex. G at 1114–15.) Lettis testified that the fact that only Kachianos was returned to work, was proof of the Union's bad faith. (*See id.* at 116.) However, this is mere speculation and is insufficient to create a triable issue of material fact. The plaintiff has not presented any proof that Daly took a position adverse to him at the Step One meeting. Accordingly, the Court concludes that the Union did not breach its duty of fair representation by having Daly represent both Kachianos and Lettis during Step One of their respective grievances.

*Dilatory Conduct*

 Lettis alleges that the Union breached its duty of fair representation by its dilatory conduct in the Removal grievance proceedings and arbitration. *See Cruz v. Local Union Number 3 of the Int'l Brotherhood of Elect. Workers,* 34 F.3d 1148, 1153 (2d Cir.1994) ("Included in the duty of fair representation is 'fair and prompt consideration and, if dictated by legal standards, processing on behalf of employees of their claims under contract dispute resolution procedures.'") (quoting *Ames v. Westinghouse Elec. Corp.,* 864 F.2d 289, 293 (3d Cir.1988)). However, Lettis offers no evidence by the submission of documents or deposition testimony, demonstrating that most grievances are processed more expediently or that the Union's response time was otherwise egregiously substandard. Although the Second Circuit "has recognized that a union may breach its duty when it fails to process a meritorious grievance in a timely fashion with the consequence that arbitration on the merits is precluded," *Young v. United States Postal Service,* 907 F.2d 305, 308 (2d Cir.1990) (citing cases), Lettis does not dispute that Branch 6000 had grieved the dispute or submitted the dispute to arbitration within the time limits imposed by the CBA, nor does he state how he was

prejudiced by the alleged delay. Consequently, the Court concludes that the alleged delay in processing the Removal grievance and arbitration did not result in a breach of the duty of fair representation, as a matter of law.

*Union's Preparation for and Performance at the Arbitration*

Lettis criticizes the Union's preparation and performance at the Removal arbitration. The plaintiff maintains that the Union breached its duty of fair representation by failing: (1) to call witnesses; (2) to locate a potential witness; (3) to introduce evidence of Kachianos' alleged mental and disciplinary problems and the poor working environment at the Williston Park Post Office; and (4) to strike Otto's testimony. The Court finds the plaintiff's arguments unavailing.

First, the plaintiff asserts that Prestano failed to call Bob Green, Billy Fisher, Bill Britton, Nick Sicilano, and Bud Peterson, Lettis' pastor, as witnesses. Lettis contends that it was Bob Green who intervened in the altercation, not Celentano, as Celentano had testified at the Removal arbitration. Therefore, Lettis asserts that Bob Green could have refuted Celentano's testimony. Significantly, the Court notes that Lettis does not set forth the substance of the testimony which would have been proffered by these witnesses.

On the other hand, the Union maintains that Lettis desired more character witnesses in his defense but when Prestano began to interview the people Lettis wished to call, they did not have any helpful character testimony and that many did not wish to testify on Lettis' behalf. (Prestano Decl. ¶ 31.) Although the parties contend that each advised the other to contact Lettis' pastor, the Union maintains that both Ray Beers and Robert Solitto served as character witnesses for the plaintiff and in its judgment, additional character witnesses would not have helped his case. (*Id.*) According to the Union,

other witnesses, such as Bob Green, would have hurt Lettis' case. (*Id.*) Bob Green testified at his deposition that both men were arguing and that Lettis told Kachianos to "meet him after work." (Seltzer Supp.Decl. dated 7/5/98, Ex. C.) Bob Green did not recall physically restraining Lettis or Kachianos. (*Id.*)

In the Court's view, the most ominous view of the Union's alleged failure to call additional character witnesses is that it reflects an error of judgment. "[T]hese omissions by themselves do not support a claim of bad faith." *Kirkland v. Local 32B/32J, Int'l Service Workers Union,* No. 90 CIV. 2238, 1992 WL 71883, at *3 (S.D.N.Y. March 31, 1992). In addition, the deposition testimony of Bob Green does not reflect the plaintiff's position that Bob Green, not Celentano, physically restrained Kachianos, and the plaintiff's failure to otherwise provide the substance of the testimony which would have been elicited from the other witnesses is a fatal deficiency. "By failing to demonstrate by competent evidence that the substance of the uncalled witnesses' testimony might in any way have affected the outcome of the arbitration, [the plaintiff] 'has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.'" *Phillips v. Lenox Hill Hospital,* 673 F.Supp. 1207, 1214 (S.D.N.Y.1987) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)); *see also Passo v. United States Postal Service,* 631 F.Supp. 1017, 1020–1022 (S.D.N.Y.1986) (the plaintiff's contention that union failed to interview witnesses was rejected where the plaintiff failed to establish that these witness' testimony could have helped his case). During the Removal arbitration hearing, Prestano called Don Daly, Ray Beers, Robert Sollitto, John Bruno, and Marian Kang as witnesses. In addition, the plaintiff testified on his behalf. Affording every benefit of the doubt to the plaintiff, the Court finds that Lettis was not in agreement with Prestano's strategy

of representation, which would not support a cause of action for unfair representation. *See Briggs v. National Rural Letter Carriers' Assoc.,* No. 86 CIV. 2401, 1989 WL 125861, at * 5 (S.D.N.Y. Oct 19, 1989).

■ Second, Lettis cites the Union's failure to locate a potential witness, a truck driver, as evidence of the Union's bad faith:

*Although the truck driver's testimony may not have been too helpful,* Prestano and the Union should have taken steps to find him because he was an individual who was in a location proximate to where the incident transpired and could possibly have had vital information regarding the incident. If I was able to find this driver after calling two people, I do not believe that the burden placed on the Union to locate the truck driver was too difficult. Also, when I asked Prestano if he had found the driver he stated "I am not a detective." The Union's and Prestano's indifference to my suggestions that he be located demonstrates the Union's bad faith and its perfunctory performance.

(Lettis Aff. ¶ 27) (emphasis added). At his deposition, the plaintiff testified about the truck driver, as follows:

Q Has Mr. Thompson made a statement for you?

A No.

Q Has he signed a statement?

A No.

Q Have you met with him?

A No.

Q Have you talked to him?

A I spoke to him once on the phone. He said he didn't want to get involved.

Q Did you talk to him about the incident?

A Yes, a little bit.

Q What did he say?

A He said, "When it was all over, I heard yelling and screaming, but I didn't really see everything." So I asked him, I said, "Are you telling the truth?" And then he tells me he didn't want to get involved, which I can understand.

Q Other than saying he heard a lot of yelling and screaming, did he say anything else about what he saw that day?

A No.

Q Or heard?

A No, he didn't.

Q Did he say whether he saw Mr. Kachianos do anything?

A He didn't say.

Q Did he say whether he saw you do anything?

A He didn't say. He was very evasive. . . .

(Seltzer Decl., Ex. G at 118–19.) Given the above-cited deposition testimony by the plaintiff, the Court doubts that the truck driver's testimony at the arbitration would have benefitted Lettis. As stated above, the plaintiff bears the burden of establishing that a witness' testimony would have been useful. *See Passo,* 631 F.Supp. at 1020–1022. In light of his concession that the truck driver's testimony would not have been beneficial or have made a difference in the outcome of the arbitration, Lettis cannot establish that the Union's failure to locate the truck driver constitutes bad faith or perfunctory performance.

■ Third, Lettis maintains that the Union failed to introduce into evidence: (1) a climate survey of the Williston Park Post Office dated October 1993; (2) information regarding Kachianos' alleged mental and disciplinary problems; and (3) the drinking which allegedly occurred at the Williston Park Post Office. Lettis asserts that the climate survey dated October 1993 in which the letter carriers at the Williston Park Post Office rated their station 4.97, on a scale of 1 to 10, "in many aspects thereof indicates the poor communication and poor performance of the manage-

ment." (Lettis Aff. dated 6/28/98 ¶ 28.) Lettis cites Branch 6000's use of a climate survey dated February 14, 1995 in the arbitration held in July 1995 regarding letter carrier Gerald Carmody's ("Carmody") removal (the "Carmody Arbitration"), as a result of which arbitration Carmody was reinstated, as proof of the Union's breach of duty of fair representation. However, upon a review of the Carmody Arbitration award, the Court finds that the climate survey was not relied upon to any great extent by the arbitrator in reinstating Carmody. In any event, the arbitration over Carmody's removal involved a different employee with a different disciplinary and work history. Indeed, the Court agrees with the Union that "the reinstatement of Carmody shows how an employee's previous history is often highly relevant to an arbitrator's ruling on just cause for removal." (Union's Reply Memo. at 6.) The Court concludes that the failure of the Union to present the climate survey was negligence, at most. *See Caputo*, 730 F.Supp. at 1232 ("The union's failure to argue a plausible theory, articulated in hindsight by [the employee's] counsel is simply insufficient to establish the grounds for a breach of the duty of fair representation, given that at best such a failing would be attributable to negligence.").

 Likewise, the Court finds that the failure of the Union to present evidence of the alleged drinking which occurred at the Williston Park Post Office, and to strike Otto's testimony does not rise to the level of arbitrary, perfunctory, or bad faith behavior.

 Finally, regarding the evidence pertaining to Kachianos, Lettis states that he does "not think that Prestano or the Union even attempted to determine if Kachinaos had a discipline problem and, if they did, they failed to introduce that problem as evidence." (Lettis Aff. ¶ 29.) Lettis has provided no evidentiary support that Kachianos had a disciplinary history. The plaintiff does not supply excerpts of

deposition testimony of witnesses that support this allegation. Rather, he states that

> [t]he affidavits of other employees who attest to much of the foregoing are unavailable. I have spoken to a number of them and they are fearful that, if they supply an affidavit, their jobs will be in jeopardy. I am fully confident that once called to be witnesses, these employees will give truthful answers.

(Lettis Aff. dated 6/27/98 ¶ 35.) However, "the mere possibility that a factual dispute may exist, without more, is not sufficient to overcome a convincing presentation by the moving party." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980). This bald assertion uncorroborated by any evidence, standing alone, cannot and does not serve as a basis for withstanding the Union's motion for summary judgment.

 In sum, the Union's representation during the Removal proceedings was not a cursory one, nor was the Union's conduct arbitrary, discriminatory, or in bad faith, as a matter of law. The Union argued that Kachianos was the aggressor and raised the issue of disparate treatment. As stated above, it presented witnesses and Lettis testified on his own behalf. In the Court's opinion, "[u]nion officials are not attorneys, and should not be held to a standard akin to legal malpractice." *Smith v. Drug, Chemical, Cosmetic, Plastics and Affiliated Industries Warehouse Employees Local 815*, 943 F.Supp. 224, 241 (E.D.N.Y.1996); *see also Woods v.. Dunlop Tire Corp.*, 1988 WL 66173, at *4 (W.D.N.Y. June 23, 1988); *Passo*, 631 F.Supp. at 1022. The Union's alleged breaches, either viewed independently or collectively, are insufficient to state a claim of unfair representation. "Under all these circumstances, [the plaintiff]'s claim is reduced to a complaint about the tactics by which the union made its case, not about the substance of the case, and such a claim does not sustain a breach of good faith action." *Phillips*, 673 F.Supp. at 1215.

The Union's conduct may even rise to the level of negligence. However, evidence of mere negligence cannot support a claim of breach of duty of fair representation.

### ii. *Likelihood that the Breach Contributed to an Erroneous Arbitration Award*

▮ Even if the Court concluded that the Union breached its duty of fair representation, Lettis has not presented evidence of any nexus between the alleged breach and the outcome of the arbitration. Lettis does not allege that the delay in the Removal proceedings caused him any injury. The plaintiff does not and cannot contend that the Union's delay in enforcing his rights prejudiced the arbitrator's decision. The Court similarly finds that Lettis has not presented any evidence that the Union's failure to advise him of the Step One meeting contributed to the erroneous outcome of the Removal arbitration. Nor does the plaintiff present evidence that a privately retained attorney would have attained a different result; he merely states that "if I had obtained counsel from the outset the outcome of my grievance might well have been different." (Lettis Aff. ¶ 30.) Such a speculatory and conclusory allegation is insufficient to raise a material triable issue of fact.

As to the alleged conflict of interest, Lettis does not set forth how Daly's alleged conflict undermined the Removal arbitration. The plaintiff has not presented any evidence of the effect of this alleged conflict of interest. Furthermore, Lettis does not present evidence of how the Union's alleged failure to believe his version of the events prejudiced him. It is undisputed that Branch 6000 took his grievance to arbitration and argued that Kachianos, not Lettis, was the aggressor. (Prestano Decl., Ex. 19 at 6.) The Removal arbitration award reflects that the question of who instigated the altercation was irrelevant:

Even if, arguendo, Kachianos can be considered the aggressor (CP. Fred Otto's written statement said "I clearly heard taunting by John Lettis towards Andy Kachianos"), it is the duty of each participant to step backward, and to de-escalate the tension. A participant who physically or verbally continues to extend the conflict and increase its intensity commits a very serious offense, and, in effect, becomes the aggressor.

(*See id.* at 9.) The plaintiff does not present evidence that the Union did not believe him or that the Removal arbitration was in any way affected by conduct related to the subjective belief as to his version of the altercation.

The failure to call witnesses, introduce certain evidence, and strike certain testimony did not, in the Court's opinion, undermine the arbitrator's decision. The arbitrator's decision focused on the altercation between Lettis and Kachianos, Lettis' disciplinary history, and the hostile working atmosphere that Lettis created. Thus, the Court finds that the alleged deficiencies in the Union's representation would not have altered the arbitrator's decision.

The Court concludes that the Union's allegedly poor preparation did not seriously undermine the Removal arbitration process and the Union's allegedly poor representation at the arbitration hearing did not cause the arbitrator to decide incorrectly. Rather, the alleged inadequacies in the Union's representation individually, or in their totality, do not present a material issue of fact as to whether the Union's conduct affected the Removal arbitration award. In the Court's view, this is not a case where the arbitral process "has fundamentally malfunctioned by reason of the bad faith performance of the Union...." *Hines*, 424 U.S. at 569, 96 S.Ct. 1048. As the Supreme Court has stated, "The grievances processes cannot be expected to be error-free. The finality provision has sufficient force to surmount occasional instances of mistake." *Id.* at 571, 96 S.Ct. at

1059. After resolving all reasonable inferences in Lettis' favor, the Union's conduct may have been negligent or may have constituted an error in judgment but it was, in this Court's view, certainly not perfunctory, arbitrary, or conducted in bad faith. Because the Court finds that Lettis cannot prevail on his claim that the Union breached its duty of fair representation, the Removal arbitration award may not be disturbed.

### 2. *USPS*

#### a. *Emergency Suspension*

 USPS likewise argues that the plaintiff's claim of breach of the CBA arising from the Emergency Suspension, is time-barred. The Court agrees. The Court finds that the plaintiff's claim against the USPS for breach of the CBA arising from the Emergency Suspension accrued, at the latest, when the plaintiff received a copy of the March 11, 1994 Award, and is time-barred. Accordingly, the Court grants USPS' motion for summary judgment as to this claim.

#### b. *Removal*

As stated above, because Branch 6000 was the plaintiff's exclusive bargaining agent, Lettis was required in this hybrid action to prove that the Union breached its duty of fair representation before proceeding against the USPS. "The 'indispensable predicate' of a[n] ... action against an employer is a 'demonstration that the Union breached its duty of fair representation.'" *Flanigan*, 942 F.2d at 828–29 (quoting *United Parcel Serv., Inc. v. Mitchell*, 451 U.S. 56, 62, 101 S.Ct. 1559, 1563, 67 L.Ed.2d 732 (1981)); *see also White*, 128 F.3d at 113; *Young*, 907 F.2d at 307. Because the Court has determined that the plaintiff is unable to prevail on his claim arising from the Removal proceedings against the Union, the plaintiff is unable to fulfil the "indispensable predicate" of his cause of action against the USPS. Consequently, the plaintiff is unable to prevail on his claim against the USPS for breach of the CBA and thus, the Court grants USPS' motion for summary judgment as to this claim.

### 3. *Individual Defendants*

#### a. *Peggy Eng. Fred Otto, Joe Celentano, and Andy Kachianos*

##### i. *Assault, Battery, Defamation, and Intentional Infliction of Emotional Distress*

 Section 215(3) of the New York Civil Practice Law and Rules (" § 215(3)") provides that intentional torts such as "assault, battery, false imprisonment, malicious prosecution, libel, slander, [and] false words causing special damages are limited by a one-year statute of limitations." *See also Casper v. Lew Lieberbaum & Co. Inc.*, No. 97 Civ. 3016, 1998 WL 150993, at *5 (S.D.N.Y. March 31, 1998). The one-year statute of limitations of § 215(3) for intentional torts applies to claims of intentional infliction of emotional distress. *Ornstein v. Pakistan Intern. Airlines Corp.*, 888 F.Supp. 28, 31 n. 11 (S.D.N.Y.1995); *Williams v. Brooklyn Union Gas Co.*, 819 F.Supp. 214, 231 (E.D.N.Y.1993); *Rosado v. New York*, 713 F.Supp. 124, 125 n. 2 (S.D.N.Y.1989); *Koster v. Chase Manhattan Bank, N.A.*, 609 F.Supp. 1191, 1198 (S.D.N.Y.1985). In *Koster*, the court stated that for claims of intentional infliction of emotional distress "[a]ll acts occurring before the limitations period are excluded from consideration." *Koster*, 609 F.Supp. at 1198; *see also Weisman v. Weisman*, 108 A.D.2d 853, 485 N.Y.S.2d 570 (2d Dep't 1985).

### *Assault and Battery*

 Causes of action for assault and battery accrue immediately upon the occurrence of the tortious act and thus, are not appropriate for the continuing violation exception. *Abdullajeva v. Club Quarters, Inc.*, No. 96 CIV. 0383, 1996 WL 497029, at *7 (S.D.N.Y. Sept.3, 1996). In the present case, the alleged altercation between Let-

tis and Kachianos occurred on November 16, 1993, more than one year before the plaintiff commenced this action on February 15, 1995. Accordingly, the plaintiff's claims of assault and battery against Kachianos are barred by the statute of limitations.

*Defamation*

■ Like assault and battery, a cause of action for defamation accrues immediately upon the occurrence of the tortious act and thus, is not appropriate for the continuing violation exception. *Id.* The plaintiff asserts in his complaint that the acts of defamation of which he complains occurred "prior to November 16, 1993." (*See* First Am.Compl. ¶ 53.) This action was commenced with the filing of a *pro se* complaint on February 15, 1995, more than one year from November 16, 1993. At his deposition, Lettis confirmed that the alleged defamatory statements were made more than one year prior to the commencement of this action.

The plaintiff alleges that Celentano defamed him by telling Kachianos that Lettis had reported Kachianos for "working off the clock," an infraction of the USPS work rules. (*See* First Am.Compl. ¶ 54; Goldberger Decl. dated 6/3/98 ("Goldberger Decl."), Ex. 3 at 55–56.) The plaintiff testified at his deposition that this statement was made sometime in 1993 but prior to November 16, 1993. (Goldberger Decl., Ex. 3 at 55–56.) Hence, the Court finds that Lettis claim of defamation against Celentano is barred by the statute of limitations.

In addition, the plaintiff alleges that Otto defamed him by stating that he was "no good. He's a troublemaker. He should be removed from the Postal Service. His wife should divorce him." (First Am.Compl. ¶ 56; Goldberger Decl., Ex. 3 at 44.) The plaintiff testified at his deposition that these statements were made in 1990 or 1991, and in 1993. (Goldberger Decl., Ex. 3 at 44–46, 56.) Accordingly, the statute of limitations bars these state-

ments allegedly made by Otto from forming the basis for a defamation cause of action.

■ At his deposition, the plaintiff also maintained that Otto defamed him while testifying at the Removal arbitration. (Goldberger Decl., Ex. 3 at 45.) The arbitrator noted in his decision to uphold Lettis' removal that Otto "testified that after the altercation Lettis said to Kachianos 'I'll see you at the candy store,' . . . a reference to a lunch place . . . ." (*See* Prestano Decl., Ex. 19 at 9–10.) However, the Court finds that Otto's testimony at the Removal arbitration is privileged. Statements made during quasi-judicial proceedings, like those made during formal judicial proceedings, are entitled to absolute immunity. *Allan and Allan Arts Ltd. v. Rosenblum*, 201 A.D.2d 136, 139, 615 N.Y.S.2d 410, 412 (2d Dep't 1994), *cert. denied*, 516 U.S. 914, 116 S.Ct. 301, 133 L.Ed.2d 207 (1995). The rationale behind such immunity has been explained as follows:

> The function of witnesses is fundamental to the administration of justice. The court's judgment is based on their testimony and they are given every encouragement to make a full disclosure of all pertinent information within their knowledge. 1 Harper & James, *supra* at 424. The common law perceived that the policy of encouraging a witness' free and uninhibited cooperation in the fact-finding process would best be served by insulating the witness from the threat of civil liability for his testimony. Without such immunity, the witness might gauge each of his statements in terms of the possibility of his own personal liability and, therefore, lack the candor and freedom of expression considered essential to the proper functioning of the judicial process. *See* Veeder, Absolute Immunity in Defamation: Judicial Proceedings, 9 Colum.L.Rev. 463, 469 (1909). The resulting lack of any civil remedy against the dishonest witness "is simply part of the price that is paid for wit-

nesses who are free from intimidation by the possibility of civil liability for what they say." Prosser, *supra* at 778.

*Dale v. Bartels*, 552 F.Supp. 1253, 1267 (S.D.N.Y.1982), *rev'd in part on other grounds*, 732 F.2d 278 (2d Cir.1984).

Courts have held that testimony at arbitrations are entitled to absolute immunity. *See e.g., Hasten v. Phillips Petroleum Co., Inc.*, 640 F.2d 274, 278 (10th Cir.1981) ("federal labor law and policy require the absolute privilege rule as to communications made within the context of proceedings provided for by the collective bargaining agreement and its provisions for a grievance machinery"); *Shearson Hayden Stone, Inc. v. Liang*, 493 F.Supp. 104, 109 (N.D.Ill.1980) (testimony in arbitration proceeding was absolutely privileged), *aff'd*, 653 F.2d 310 (7th Cir.1981); *Barnes v. Avis Rent A Car System, Inc.*, 466 F.Supp. 907, 910 (D.D.C.1979) (statements made at union arbitration proceeding are privileged) (citing *Joftes v. Kaufman*, 324 F.Supp. 660 (D.D.C.1971)); *Corbin v. Washington Fire and Marine Ins. Co.*, 278 F.Supp. 393, 398–99 (testimony offered at arbitration is privileged), *aff'd*, 398 F.2d 543 (4th Cir.1968); *Fulghum v. United Parcel Service, Inc.*, 424 Mich. 89, 98–99, 378 N.W.2d 472 (1985) ("accusations of dishonesty made during grievance proceedings provided for in the collective bargaining agreement cannot be the basis of a common-law action for defamation").

In the Court's opinion, defamation suits predicated on statements made in the grievance procedures would tend to inhibit the offer of honest statements in arbitration proceedings. Federal policy is to promote industrial stabilization through collective bargaining agreements, and to achieve industrial peace through the inclusion of a provision for arbitration of grievances in such agreements, which is "part and parcel of the collective bargaining process itself." *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578, 80 S.Ct., 1347, 1351, 4 L.Ed.2d 1409 (1960). Unions and employ-

ers take the favored step of establishing grievance procedures in order to avoid the need for judicial intervention. Permitting a defamation suit arising from testimony proffered at an arbitration would undermine federal labor policy, which encourages settlement of labor disputes through nonjudicial means. The chilling effect resulting from the possibility of a defamation claim against a witness would loom over every arbitration and would jeopardize the entire contract process. Thus, the Court finds that the testimony offered by Otto at Lettis' Removal arbitration cannot form the basis of a defamation suit and accordingly, the Court grants Otto's motion for summary judgment on this claim.

Finally, Lettis maintains that Eng defamed him when she allegedly stated that she did not "want him back in my Post Office no matter what. He's a troublemaker. He belongs to Hell's Angels." (First Am.Compl. ¶ 57; Goldberger Decl., Ex. 3 at 56–57.) Once again, the plaintiff testified at his deposition that these statements were made in approximately 1990 but prior to 1993. (Goldberger Decl., Ex. 3 at 56–57.) Likewise, the defamation claim against Eng is time-barred.

*Intentional Infliction of Emotional Distress*

The Court finds that the plaintiff's claim of intentional infliction of emotional distress is similarly time-barred. Lettis alleges that the "[d]efendants maliciously embarked on a course of conduct intended to cause plaintiff to suffer mental and emotional distress, tension and anxiety." (First Am.Compl. ¶ 72.) The plaintiff testified at his deposition that Celentano, Eng, and Otto made statements intended to cause him mental and emotional distress. The plaintiff maintains that he was the "scapegoat" at the Williston Park Post Office, and that Celentano and Otto lied about him. (Goldberger Decl., Ex. 3 at 40–41.) The statements that Otto made go back many years, starting from when the plaintiff joined the USPS. (Goldberger Decl., Ex. 3 at 41–44.) However, the

plaintiff has difficulty identifying the specific statements made by Eng, Celentano, and Otto other than those that form his defamation cause of action, to support his claim of intentional infliction of emotional distress. Lettis testified at his deposition that in 1992 or 1993, Celentano allegedly told him that no one at the Williston Park Post Office liked him. (Goldberger Decl., Ex. 3 at 49.) In addition, Celentano informed Kachianos of Lettis' "court problems" concerning his divorce and informed Kachianos that Lettis had reported him for working off the clock. (*Id.* at 50.) These statements were made more than one year prior to the commencement of this action and therefore, the Court finds that the plaintiff's claim of intentional infliction of emotional distress is time-barred.

The Court notes that even if this claim was not time-barred, summary judgment would still be granted to Eng, Celentano, and Otto because the statements complained of do not constitute the kind of outrageous conduct necessary to support this cause of action. Liability for the tort of intentional infliction of emotional distress requires "extreme and outrageous conduct, which so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society …." *Freihofer v. Hearst Corp.,* 65 N.Y.2d 135, 143, 490 N.Y.S.2d 735, 741, 480 N.E.2d 349, 355 (1985); *see also Murphy v. American Home Prods. Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 236, 448 N.E.2d 86 (1983). "New York sets a high threshold for conduct that is 'extreme and outrageous' enough to constitute intentional infliction of emotional distress." *Bender v. City of New York,* 78 F.3d 787, 790 (2d Cir.1996). Indeed, apparently, the New York Court of Appeals has never upheld a claim for intentional infliction of emotional distress. *See id.* at 791; *Howell v. New York Post Co., Inc.,* 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993).

In the present case, the plaintiff does not provide clarification of the defendants' acts in support of this claim. In opposition to the defendants' motion on this issue, the plaintiff merely states that

> [t]he question of what constitutes outrageous conduct is not something to be decided on these motions. That is a question that should be left to the trier of the facts. Plaintiff submits the acts alleged by him were clearly outrageous.

(Pl.'s Memo. in Opp. § III(D).) However, in the Court's opinion, it cannot be said that Eng, Celentano, and Otto's conduct meets the threshold standard of outrageousness. As a matter of law, the Court holds that their conduct was not so extreme in degree as to be intolerable in a civilized society. *See Natoli v. City of Kingston,* 195 A.D.2d 861, 862, 600 N.Y.S.2d 780, 781 (3d Dep't 1993) (allegations by police officer terminated by the defendant that colleagues made statements which were "reflective of a personal campaign to prevent him from being restored to payroll" not outrageous). Accordingly, the Court grants the defendants Eng, Celentano, and Otto's motion for summary judgment as to the plaintiff's claim of intentional infliction of emotional distress.

ii. *Conspiracy to Deprive Lettis of Employment and Future Employment*

As noted in the Court's previous decision permitting the plaintiff to amend his complaint, a cognizable independent civil claim for conspiracy does not exist. (Memorandum Decision and Order dated August 28, 1997 at 22.) Notwithstanding this admonition, the plaintiff persists in bringing this conspiracy claim. Even if the Court was to interpret this cause of action as one for tortious interference with employment, this claim would be barred by the one-year statute of limitations. *See Ligaya v. American Friends of the Hebrew University, Inc.,* No. 96 Civ. 240, 1998 WL 146227, at *6 (S.D.N.Y. March 25, 1998); *Catrone v. Cables & Chips, Inc.,* 96 Civ. 2149, 1997 WL 164283, at *2 (S.D.N.Y. Apr.8, 1997). The complaint states that the acts in furtherance of the conspiracy all occurred "[p]rior to Novem-

ber 16, 1993." (First Am.Compl. ¶ 64.) Indeed, the plaintiff does not respond to this argument. The Court interprets his silence as conceding the statute of limitations issue and dismisses this claim.

Similarly, if the Court were to interpret the plaintiff's claim as sounding in deprivation of future employment or as interference with prospective economic advantage, such a claim must also be dismissed. Such a cause of action exists "where a party would have received a contract but for the malicious, fraudulent and deceitful acts of a third party." *Gertler v. Goodgold*, 107 A.D.2d 481, 489, 487 N.Y.S.2d 565, 572 (1st Dep't) (quoting *Union Car Advertising Co. v. Collier*, 263 N.Y. 386, 401, 189 N.E. 463, 469 (1934)), *aff'd*, 66 N.Y.2d 946, 498 N.Y.S.2d 779, 489 N.E.2d 748 (1985).

To state a claim for tortious interference with prospective economic advantage, the plaintiff must demonstrate "(1) business relations with a third party; (2) defendants' interference with those business relations; (3) defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship." *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir.1994) (citations omitted). In the present case, Lettis testified at his deposition that he did not know of any statements by any defendant to prospective employers. (*Id.* at 63.) Indeed, the plaintiff's comments about this claim is vague:

> In reference to my claim that action of the defendants have deprived me of employment, I have made numerous attempts to obtain some but have been unable to obtain meaningful employment. I am unable to obtain employment through the appropriate New York State agency because of derogatory comments made to the N.Y.S. Unemployment Agency when and after I applied for benefits.

(Lettis Aff. ¶ 63.) The Court finds that such vague and speculative assertions are insufficient to defeat a motion for summary judgment. Lettis does not specify the derogatory comments allegedly made nor does he identify the people who allegedly made them.

In addition, at his deposition, Lettis made reference to only one occasion where he claims Celentano deprived him of an economic advantage. In 1993 or 1994, the plaintiff's credit application was denied after Celentano, who was contacted by the credit company, advised the company that the plaintiff had been terminated from the USPS. (*See* Goldberger Decl., Ex. 3 at 59–63.) This is the only instance which Lettis cited in support of this claim. However, Celentano's statement is not malicious, fraudulent, or deceitful. The plaintiff merely alleges that Celentano responded to a query from a credit agency that the plaintiff had been fired by the USPS, which is a true statement.

Even if Celentano's statement could form the basis for a claim of tortious interference with prospective economic advantage, this claim is barred by the Federal Tort Claims Act (the "FTCA"). Section 409(c) of the Postal Reorganization Act applies the FTCA to the USPS. The defendant has submitted a Certificate of Scope of Employment stating that Celentano was acting within the scope of his employment and hence, argues that the United States is the real party in interest. Since the United States has not waived sovereign immunity for a claim of tortious interference with prospective economic advantage, *see Chen v. United States*, 854 F.2d 622, 628 (2d Cir.1988); *Erbacci, Cerone, and Moriarty, Ltd. v. United States*, 939 F.Supp. 1045, 1059 (S.D.N.Y.1996), Celentano contends that the plaintiff's claim is barred by the FTCA.

In *McHugh v. University of Vermont*, 966 F.2d 67, 74 (2d Cir.1992), the Second Circuit held that the district court's de novo review of an Attorney General's certification of scope of employment is triggered "by the government's motion for substitution and opposition papers from

the plaintiff that allege with particularity facts relevant to the scope-of-employment issue." In the present case, the plaintiff merely states that "[t]he acts complained are hardly within the scope of employment of those defendants. Common sense mandates a different conclusion. Certification pursuant to 28 U.S.C. § 2679(d)(1) is not conclusive." (Pl.'s Memo. in Opp. § III(A).) These conclusory statements hardly suffice to refute in particularity the scope of employment certification. *See McAdams v. Reno,* 64 F.3d 1137, 1145 (8th Cir.1995) ("Because the certification is prima facie proof that the challenged conduct was within the scope of employment, the burden is on the plaintiff to come forward with specific facts to rebut it."); *Schrob v. Catterson,* 967 F.2d 929, 935 (3d Cir.1992) (certification is prima facie evidence that the employee's challenged conduct was within the scope of employment and the burden then shifts to the plaintiff, who must come forward with specific facts rebutting the certification). Even if the Court were to conduct a review of the limited facts provided by the parties of this claim against Celentano, it would conclude, as a matter of law, that Celentano was acting within the scope of his employment when he advised the credit agency that Lettis had been terminated.

"To determinate whether a federal employee was or was not acting within the scope of his employment, the [plaintiff] looks to the state law in which the allegedly wrongful conduct took place." *Maldonado v. Colon,* No. 97 CIV. 3966, 1998 WL 240479, at *3 (S.D.N.Y. May 12, 1998). In this case, the Court applies New York law on the scope of employment. Under New York law, the test for whether an employee is acting within the scope of his employment "has come to be 'whether the act was done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions.'" *Riviello v. Waldron,* 47 N.Y.2d 297, 302, 418 N.Y.S.2d 300, 302, 391 N.E.2d 1278, 1281 (1979) (citations omit-

ted). Applying this standard to the present case, Celentano was a supervisor at the Williston Park Post Office. As such, the fact that Celentano responded to a credit agency's inquiry regarding Lettis would, in the Court's view, fall within the scope of his employment. As Celentano was acting within the scope of his employment, the United States is the real party in interest as to this aspect of the plaintiff's claim. However, the United States has not waived sovereign immunity for a claim of tortious interference with prospective economic advantage. *See Chen,* 854 F.2d at 628; *Erbacci,* 939 F.Supp. at 1059. Hence, this claim must be dismissed.

In conclusion, the Court grants Eng, Celentano, and Otto's motion for summary judgment as to the plaintiff's claim of tortious interference with prospective economic advantage.

#### b. *Don Daly and Dominic Prestano*

Daly and Prestano maintain that the plaintiff's claims of conspiracy to deprive him of his employment and of future employment, and intentional infliction of emotional distress, are preempted by the PRA because they relate to the representation of Lettis in the Emergency Suspension and Removal proceedings. However, for the reasons that follow, the Court need not reach the issue of preemption because the plaintiff's claims fail on other grounds.

#### i. *Conspiracy to Deprive Lettis of Employment and Future Employment*

As stated above, an independent cause of action for conspiracy does not exist and therefore, the plaintiff's claim of conspiracy to deprive him of his employment and future employment is dismissed. Were the Court to give a very liberal construction of this cause of action, the only allegation in the complaint regarding this claim which specifically mentions either of the individual Union defendants Daly or Prestano, is that the "[d]efendants Eng, Prestano, Celentano and Otto conspired to allow or create an incident to

cause the plaintiff to be removed and falsely charged that the plaintiff had provoked the actions of Kachianos." (First Am. Compl. ¶ 65.) There are no specific allegations in the complaint concerning Daly. Rather, the plaintiff makes the general allegation that the "defendants conspired with each other and formed a deliberate design and purpose to injure plaintiff and to cause him to lose a valuable property right, to wit, his employment and possible future employment, as well as unemployment...." (*Id.* ¶ 64.)

When asked at his deposition what evidence Lettis had to support this claim against Prestano, he gave the following response:

Q Do you have any evidence of Mr. Prestano being involved in the conspiracy to allow or create an incident to cause you to be removed and falsely charged other than what you've just testified to?

A Dominic knew all about Otto when he was a shop steward, I used to tell him. It took him a while to have Otto removed as shop steward and I replaced him. The other thing, he knew what was going on in the office. The office was a time bomb, if you really want to know, and talking to Dominic was like talking to the walls because he didn't want to do nothing.

Q Was that because he didn't agree with everything you wanted him to do?

A No, I went by the union rules and anything I—Daly, himself, called up Prestano about people working off the clock and he still refused to do it.

Q I'm talking about your arbitration.

A Same thing.

Q What is the same thing?

A There shouldn't have been an arbitration.

Q Do you have any evidence, other than what you've just testified about, that Prestano conspired to allow or

create an incident, which is what happened on November 16?

A Yes. Other than when Andy was brought back and I wasn't brought back, I asked him—I questioned him and he got very verbally abusive to me on the phone, so I hit a nerve there and I said—so I think maybe he was in cahoots with Eng to bring Andy back and leave me out.

Q If the postal service decided to bring Kachianos back, do you think that the union had a responsibility to stop them from doing that?

A Sure, they did. Because, first of all, Kachianos was lying, he wasn't telling the truth. He assaulted me, not once, but twice and I had an eyewitness that saw it too.

Q So you believe that the fact that the postal service brought Mr. Kachianos back proves that the union was involved in the conspiracy?

A Yes, I do.

(Seltzer Decl., Ex. G at 114–16.) Such speculative assertions do not suffice to defeat a motion for summary judgment. When questioned regarding his claim of intentional interference with future employment, Lettis replied as follows:

Q Is it your contention that any of the other individual defendants [other than Celentano] in this action made statements to prospective employers about you?

A Other individuals, no, I don't know.

(Goldberger Decl., Ex. 3 at 63.)

In addition, the plaintiff contends that the Union, specifically Prestano, refused to assist him in obtaining unemployment benefits. (Pl.'s Memo. in Opp. § III(C).) This latter allegation is most likely preempted by the PRA since it concerns the Union's obligations, if any, pursuant to the Union Constitution to assist Lettis in obtaining such benefits. The plaintiff does not state that the Union, specifically Prestano, had an affirmative duty pursuant to the Union Constitution to assist Lettis ob-

tain unemployment insurance. Even if this allegation was not preempted, it is insufficient to state a claim since the plaintiff does not maintain that Prestano interfered or prevented him from obtaining unemployment benefits from the appropriate state agency; rather, Prestano merely did not aid Lettis. Hence, given the lack of evidence presented by the plaintiff as against Daly and the insufficiency of the evidence as against Prestano, the Court grants summary judgment on this cause of action as against Daly and Prestano.

### ii. *Intentional Infliction of Emotional Distress*

 Lettis provided the following deposition testimony regarding his claim of intentional infliction of emotional distress as against Daly and Prestano:

Q Is your evidence of Mr. Prestano and Mr. Daly "maliciously embarking on a course of conduct intended to cause mental and emotional distress" the same evidence that you gave in response to my earlier questions about the conspiracy [to interfere with his employment and for future employment]?

A Yes. Other than, like I said, Daly was friends with Kachianos and anything management told Daly he would believe. No matter what I told him he wouldn't believe me.

Q Did he tell you he didn't believe you?

A Yes, he did, a couple of times.

Q When did he do that?

A When I was working there prior to '93 and my discharge.

Q Did he tell you he didn't believe you in regard to the incident of November that resulted in your suspension?

A I never got to talk to Daly.

(Seltzer Decl., Ex. G at 116.) Even if this claim was not preempted, the plaintiff's claim would be dismissed because the transgressions which the plaintiff de-

scribes are clearly not within the purview of "extreme" or "outrageous" behavior. As stated above, the plaintiff in his opposition papers to the present motions, does not expand on the factual bases for this claim but rather asserts that this issue should be decided by the trier of fact and in a conclusory fashion, alleges that the acts are outrageous. Accordingly, the Court grants the defendants Daly and Prestano's motion for summary judgment as to the plaintiff's claim of intentional infliction of emotional distress. The Court notes in passing that such a cause of action arising from any statements made by Daly prior to 1993 is time-barred.

### III. CONCLUSION

Having reviewed the parties' submissions and for the reasons set forth above, it is hereby

**ORDERED,** that the defendants' motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, is **GRANTED** in all respects. The First Amended Complaint is dismissed in its entirety.

The Clerk of the Court is advised that this decision closes the case.

**SO ORDERED.**